## AFFIDAVIT

Special Agent Brenna McIntosh, being duly sworn, states as follows:

1.     I am a Special Agent of the Drug Enforcement Administration (DEA), and have

been so employed for over 19 years.  Throughout my career, I have been the case

agent on numerous complex drug investigations involving search warrants, arrest

warrants, and seizure warrants.  Over the past 19 years, I have investigated a variety

of drug criminal cases.

2.     As a Special Agent employed by the DEA, I am authorized to investigate

violations of Title 21, United States Code (U.S.C.), Sections 841(a)(1), 841(b)(1)(C),

843, and 846.  These violations, and others discussed below, are being investigated in

this case to determine if controlled substances are being inappropriately dispensed.

With the assistance of the Internal Revenue Service-Criminal Investigation (IRS-CI),

the DEA is also investigating alleged federal offenses involving Title 31, U.S.C.

Sections 5324 and 5313 (Structuring), and Title 18, U.S.C. Sections 1956 and 1957

(Money Laundering), by Howard S. Weiss, M.D. with the specified unlawful activity

of the distribution and/or dispensing of controlled substances without a legitimate

medical purpose, which is a violation of Title 21, U.S.C. Section 841.

3.     I am currently assigned to the DEA Denver Division Tactical Diversion Squad

(TDS).  The TDS investigates and prepares for prosecution cases against suspected

violators of the Controlled Substances Act, Code of Federal Regulations (21 CFR),

and other appropriate federal or state statutes pertaining to the diversion of

pharmaceuticals and chemicals.  This unique group combines the resources of DEA

1

(both Special Agents and Diversion Investigators) with other federal, state, and local law enforcement agencies in an innovative effort to investigate those involved in diversion schemes.  The TDS investigates "doctor shoppers," prescription forgers, and prevalent retail-level violators in order to disrupt diversion at the registrant level (practitioners, pharmacies, chemical handlers, etc).  The TDS develops sources of information and disseminates intelligence to appropriate elements for the development of leads and targets. They also participate in law enforcement authority activities as required (e.g., purchase of evidence/purchase of information, conducting surveillance, conducting undercover operations, making arrests, and executing search/seizure warrants).

4.      Information contained in this Affidavit is a compilation of investigative work communicated verbally and in writing to me.  It should be noted that I have not attempted to provide every detail of this investigation in a single affidavit due to the length and magnitude of this case.  The information contained herein is an attempt to provide a summarized version of the investigation.

## INTRODUCTION

5.      This Affidavit is made in support of an application for a warrant to search the business premises of **Dr. Howard S. Weiss, MD**.  Dr. Weiss conducts business at 6900 E. Belleview Avenue, Suite 205, Greenwood Village, Colorado 80111, more fully described in Attachment A, attached hereto and fully incorporated herein.

6.      I seek to search the location mentioned above for property that constitutes evidence of the commission of criminal offenses, contraband, the fruits of a crime, or

2

things otherwise criminally possessed, or property or computerized information, storage media or paper documentation designed or intended for, or which is or has been used as the means of committing, facilitating, or concealing a criminal offense, in violation of Title 21, United States Code (U.S.C.), Sections 841(a)(1), 841(b)(1)(C), 843, and 846 (Controlled Substances Violations) in further violation of 21 Code of Federal Regulations (CFR) §§ 1306.04 and 1306.05; in violation of Title 31, U.S.C. Sections 5324 and 5313 (Structuring); and in violation of Title 18, U.S.C. Sections 1956 and 1957 (Money Laundering). Violations of Title 21, United States Code, Sections 841 (a)(1), 841 (b)(1)(C), 843, and 846, and Title 21 Code of Federal Regulations (CFR) §§ 1306.04 and 1306.05 are being investigated in this case to determine if controlled substances are being illegally dispensed.  Items sought to be seized are listed in Attachment B.

7.     Information developed during the investigation revealed that the above-mentioned location contains medical records associated with Dr. Weiss's medical practice including medical records, private insurance records, scheduling records, billing records, and patient medical charts.  Such records, as described herein, are usually maintained both in hardcopy form and on computer systems.  The records will show Dr. Weiss dispensed controlled substances without a legitimate medical purpose.

8.     Additionally, because Dr. Weiss conducts his practice from the location described in Attachment A, I believe financial records will be located on the premises that will demonstrate the flow of monies associated with the illegal dispensing of controlled substances.

9.      This affidavit also supports applications for seizure warrants for the following

assets, pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A) and (C), and 31

U.S.C. § 5317:

   A.      All funds held in Bank of the West account # 40936981 in the name of

   Howard S. Weiss, M.D.;

   B.      All funds up to $840,347.10 held in Merrill Lynch account #85A-15623 in

   the name of Howard Weiss;

   C.      All funds held in Merrill Lynch account #85A-15733 in the name of

   Howard Weiss; and

   D.      All funds held in Merrill Lynch account #85A-83997 in the name of

   Howard Weiss.

10.      As set forth herein, there is probable cause to believe that the funds held in the

financial accounts identified above constitute proceeds from Dr. Weiss' distribution

and dispensing of controlled substances without a legitimate medical purpose and

outside the usual course of professional practice. In addition, there is probable cause

to believe that the funds held in the financial accounts identified above are property

involved in money laundering.

## BACKGROUND OF INVESTIGATION

11.      On the morning of November 10, 2016, Jared DeHaan[1] was found unresponsive in

his bathroom by his fiancée, Tiffany Nagao, and "911" was called.  Jared DeHaan was

---

[1]Consulting expert Dr. Mark Walter, M.D., identified Jared DeHaan as one of many patient cases below, based only
upon his review of PDMP data, for the purpose of identifying any patterns of prescribing behavior which, within a

living with Tiffany Nagao at Tiffany Nagao's family's residence in Castle Rock, Colorado at the time.  Taylor Nagao (Tiffany's sister) performed CPR on DeHaan until Douglas County Sheriff's Officers responded to the residence in reference to a medical assist.  Emergency Medical Services (EMS) arrived shortly thereafter; however, they were unable to revive DeHaan, who was pronounced dead at 11:22 a.m. on November 10, 2016.  Investigators found a piece of foil with burnt residue and a rolled up dollar bill with brown residue on the end in the bathroom with DeHaan.  The coroner's report lists DeHaan's cause of death as combined drug intoxication with the toxicological evidence of heroin along with other medications in the peripheral blood.  Douglas County Sheriff's Office Detectives shared what they learned during the death investigation of DeHaan with the Drug Enforcement Administration.

12.    Douglas County Sheriff's Officers and Detectives, and later DEA Agents, learned from interviews with DeHaan's family members that DeHaan was abusing opiates, including prescription opiates and heroin, for several years and his addiction began after suffering from pancreatitis several times during high school.  DeHaan was seeing addiction psychiatrist Dr. Thurstone and had been through recovery on more than one occasion.  Despite this, the family learned DeHaan was buying prescriptions from a Dr. Howard S. Weiss (Dr. Weiss) and that DeHaan filled and then sold the prescription drugs authorized by Dr. Weiss to others.  Specifically, the

reasonable medical probability, fall outside of the usual course of psychiatric treatment and/or occur without a legitimate medical purpose.

family learned that DeHaan went to Dr. Weiss' personal residence and paid Dr. Weiss

$500.00 for prescriptions of Adderall to be filled at a pharmacy.  The family believed

DeHaan's only relationship with Dr. Weiss was for the purchase of the prescriptions.

DeHaan filled the prescriptions and sold the tablets to others or exchanged the tablets

for heroin.  After DeHaan's death on November 10, 2016, family members found a

prescription in DeHaan's vehicle written by Dr. Weiss for Adderall that had not been

filled and was dated November 15, 2016, which was after DeHaan's death.  Family

members provided to DEA the prescription written by Dr. Weiss for DeHaan,

prescription bottles from Dr. Weiss' other prescriptions that were filled, and photos of

text messages and Facebook communications documenting the distribution of

the filled prescriptions by DeHaan.

13.     Based on the reports of DeHaan's family, the post-dated prescription, and content

of the photos of text messages and Facebook communications documenting the

distribution of the filled prescriptions by DeHaan, Dr. Weiss was in violation of the

Code of Federal Regulations (21 C.F.R.) with respect to the purpose of issuing

prescriptions and the manner of issuance of prescriptions.  Specifically, the Code of

Federal Regulations (21 C.F.R) Section 1306.04 states the "Purpose of issue of

prescription. (a) A prescription for a controlled substance to be effective must be

issued for a legitimate medical purpose by an individual practitioner acting in the

usual course of his professional practice.  The responsibility for the proper prescribing

and dispensing of controlled substances is upon the prescribing practitioner, but a

corresponding responsibility rests with the pharmacist who fills the prescription.  An

6

order purporting to be a prescription issued not in the usual course of professional

treatment or in legitimate and authorized research is not a prescription within the

meaning and intent of Section 309 of the Act (21 U.S.C. Section 829) and the person

knowingly filling such a purported prescription, as well as the person issuing it, shall

be subject to the penalties provided for violations of the provisions of law relating to

controlled substances..."  Additionally, 21 C.F.R., Section 1306.05 states the "Manner

of issuance of prescriptions. (a) All prescriptions for controlled substances shall be

dated as of, and signed on, the day when issued and shall bear the full name and

address of the patient, the drug name, strength, dosage form, quantity prescribed,

directions for use, and the name, address and registration number of the

practitioner..."  As articulated in 21 C.F.R., violators of 21 C.F.R. 1306.04 shall be

subject to the penalties provided for violations of law relating to controlled

substances, therefore Dr. Weiss is also in violation of Title 21 U.S.C. Sections

841(a)(1), 841(b)(1)(C), and 846.

Prior Reporting

14.     Historically, Dr. Weiss surrendered his medical licenses in the states of Virginia

and New York in the mid-1990s due to a federal felony conviction for mail

fraud associated with insurance (Virginia) and two specifications of professional

misconduct (New York).  According to the Colorado Department of Regulatory

Agencies (DORA) website, Dr. Weiss was issued a Physician License in the State of

Colorado in 2003 and assigned License Number DR.0041466, with the next

expiration date in 2021.  Dr. Weiss is registered with the DEA as a practitioner and

assigned DEA Registration # AW1626300 with authorized drug privileges in Schedules 2, 2N, 3, 3N, 4, and 5.  Dr. Weiss' registered address with the DEA is 6900 E. Belleview Avenue, Suite 205, Greenwood Village, Colorado 80111.  Dr. Weiss is a Drug Addiction Treatment Act (DATA) Waived Physician and is authorized 100 patients (treated for dependence) per month.

15.     On June 22, 2014, Walgreens reported to DEA that they refused to fill a prescription presented at their pharmacy store located at 9141 South Broadway, Highlands Ranch, Colorado because of an "altered date."  Walgreens faxed a copy of the prescription presented at their pharmacy to DEA.  The prescription further identified the patient as Emily BA...[illegible] with a birth date of May 24, 1984.  The prescriber listed was Howard S. Weiss, M.D. with DEA Registration #AW1626300. The prescription was dated June 17, 2014 (although the "6" for June appeared altered from a "7") and was for 60 Adderall XR 30mg.  Hand written notations of "altered date" and "date changed from 7/17/14 to 6/17/14?" were also on the sheet faxed from Walgreens.

16.     A review of Colorado State Board of Pharmacy Prescription Drug Monitoring Program ("PDMP") Physician Summary records[2] of all dispensed controlled substance prescriptions written by Dr. Weiss with DEA Registration #AW1626300 for the time period July 1, 2007 through September 6, 2018 received pursuant to DEA Administrative subpoenas, further identified Emily BA...[illegible] with birth date

---

[2] The Colorado State Board of Pharmacy Prescription Drug Monitoring Program ("PDMP") Physician Summary records include the patient's name, birthdate, and address; the dispensing pharmacy's name, store number, and address; prescription number; dispensed drug(s) with quantity and date dispensed; and method of payment.

May 24, 1984 as Emily BARRY [3] .  BARRY filled prescriptions authorized by Dr. Weiss between January 2014 and August 2018.  The prescriptions were for Alprazolam 2mg tablets, Adderall XR 30mg capsules, and Dextroamp-amphetamin 30mg tablets.  Further, it appeared as though a prescription authorized by Dr. Weiss for Adderall XR 30mg capsules and dated May 19, 2014 was filled on June 20, 2014 for BARRY by Walgreens #03489, with DEA Registration #BW4411461, at 9390 S University Blvd, Highlands Ranch, Colorado; as well as a prescription authorized by Dr. Weiss for Adderall XR 30mg tablets and dated July 17, 2014 was filled on July 17, 2014 for BARRY by Walgreens #03489, with DEA Registration #BW4411461, at 9390 S University Blvd, Highlands Ranch, Colorado.

17.     A criminal history check for BARRY reported a conviction for a Menacing/Assault charge/arrest in August 2015 with a sentence of two years' probation; however, probation was dismissed after approximately one year when certain conditions were met.

18.     On July 22, 2014, Walgreens reported to DEA they refused to fill a prescription presented at their pharmacy store #04952, 9141 South Broadway, Highlands Ranch, Colorado.  Walgreens faxed a copy of the prescription presented at their pharmacy to DEA.  The prescription further identified the patient as Duncan KREBS, and the prescriber as Howard S. Weiss, M.D. with DEA Registration #AW1626300.  The prescription was dated July 21, 2014 and was for 60 Adderall 30mg.  Hand written

---

[3] Dr. Walter identified Emily Barry as one of many patient cases below, based only upon his review of PDMP data, for the purpose of identifying any patterns of prescribing behavior which, within a reasonable medical probability, fall outside of the usual course of psychiatric treatment and/or occur without a legitimate medical purpose.

notations of "pt always been on XR 30mg [symbol of "ii" with a serif between the

stems and dots of the i] qD so left message for MD to call back. Patient was upset +

took Rx back saying it should be non-XR" were also on the sheet faxed from

Walgreens.

19.     A review of Colorado PDMP Physician Summary records of all dispensed

controlled substance prescriptions written by Dr. Weiss with DEA Registration

#AW1626300 for the time period of July 1, 2007 through September 6, 2018 received

pursuant to DEA administrative subpoenas, further identified Duncan KREBS, and

reported KREBS filled prescriptions authorized by Dr. Weiss between April 2013 and

June 2016. The prescriptions were for Lorazepam 2mg tablets, Dextroamp-

amphetamin 15mg/20mg/30mg tablets, and Adderall XR 30mg capsules.  Further, it

appears as though a prescription authorized by Dr. Weiss for Dextroamp-amphetamin

30mg tablets, dated July 21, 2014, was filled on July 21, 2014 for KREBS by the

Target Pharmacy, at 1265 Sgt Jon Stiles Drive, Highlands Ranch, Colorado.

20.     A criminal history check for KREBS reported a conviction for a Driving While

Ability Impaired charge and arrest on July 30, 2014, one week after the filled

prescription identified in the previous paragraph, with a sentence of two years'

probation.  KREBS probation was revoked at least once and his Colorado driver

license was cancelled/denied.

21.     On September 2, 2014, Walmart reported to DEA they refused to fill a

prescription presented on August 28, 2014 at their pharmacy store #6634 with DEA

Registration #BS7221562 in Lone Tree, Colorado.  Walmart further identified the prescription as being presented in hard copy with the patient name of Sam Proctor, the prescriber name of Howard Weiss, the prescriber DEA Registration of #AW1626300, for 300 Ritalin 10mg.  Their reason for refusal was "other than legitimate medical purpose."

22.     DEA indices further identify the pharmacy with DEA Registration #BS7221562 as Sam's Pharmacy 10-6634, at 7817 Park Meadows Drive, Lone Tree, Colorado 80124.  A review of Colorado PDMP Physician Summary records of all dispensed controlled substance prescriptions written by Dr. Weiss with DEA Registration #AW1626300 for the time period of July 1, 2007 through September 6, 2018 received pursuant to DEA administrative subpoenas, further identified Sam Proctor as Samuel PROCTOR [4] and reported PROCTOR filled prescriptions authorized by Dr. Weiss between August 2013 and July 2018.  The prescriptions were for Alprazolam 2mg tablets, Methamphetamine 5mg tablets, Methylphenidate 10mg tablets, and Dextroamp-amphetamin 30mg tablets.  Further, it appears as though a prescription authorized by Dr. Weiss for 300 methylphenidate 10mg (Ritalin 10mg), dated August 20, 2014, was filled on the same day of August 28, 2014 for PROCTOR by Walgreens #04952, with DEA Registration #BW6577108, at 9141 S Broadway, Highlands Ranch, Colorado.

---

[4]Dr. Walter identified Sam Proctor as one of many patient cases below, based only upon his review of PDMP data, for the purpose of identifying any patterns of prescribing behavior which, within a reasonable medical probability, fall outside of the usual course of psychiatric treatment and/or occur without a legitimate medical purpose.

23.     A criminal history check for PROCTOR reported prior arrests and/or convictions

for dangerous drugs, weapons, and parole violations.  The following arrests and

convictions were reported during the time period PROCTOR was filling prescriptions

authorized by Dr. Weiss.  PROCTOR was arrested on June 1, 2015 and then

convicted of Possession of a Weapon by a Previous Offender (felony) with a sentence

of 15 months in the custody of the Department of Corrections.   His most recent arrest

occurred on July 1, 2017 for Possession of Controlled Substances with Intent to

Distribute, Vehicular Eluding, Resisting Arrest, Reckless Driving, and Failure to

Display Proof of Insurance.  The narrative from Colorado State Patrol arrest report

#1D172944 stated, in brief summary, the following for July 1, 2017:

A CSP Trooper attempted to stop a motorcycle on SB Interstate 25 in Thornton

Colorado.  The motorcycle began to elude the Trooper's signal and crash into the

Trooper's motorcycle.  The driver, PROCTOR, fled on foot and was taken into

custody a short distance later.  A scale, commonly used for weighing drugs, and a

small box with approximately 7.9 grams of marijuana were found in PROCTOR's

backpack.  A Ziploc type bag containing approximately 13.9 grams of suspected

Normorphine and Methamphetamine; a Ziploc type bag containing approximately

22.4 grams of suspected Methamphetamine; and a Ziploc type bag containing

approximately 1.5 grams of suspected heroin were found on PROCTOR's body.

24.     In August of 2015, Diversion Investigator (DI) Oesterle received information that

Nicole JOHNSON was filling prescriptions from different doctors, including Dr.

Weiss.  On September 3, 2015, DI Oesterle and DI Pickrel interviewed Dr. Weiss at

his office, 6900 E Belleview Ave, Suite 205, Greenwood Village, Colorado.  In brief summary, Dr. Weiss stated that JOHNSON had been his patient since June 25, 2013 and that he had been prescribing Adderall and a sleep aid to JOHNSON.  Dr. Weiss claimed to have spoken to JOHNSON prior to the interview with DI Oesterle and DI Pickrel, and JOHNSON denied any wrong doing.  However, Dr. Weiss identified several prescriptions from JOHNSON's PDMP that he did not write for JOHNSON. Dr. Weiss voluntarily showed the investigators his records and made the point that he kept very accurate records for JOHNSON, and that he did the same for all of his patients.

25.     A review of Colorado PDMP Patient Summary records of all dispensed controlled substance prescriptions to Nicole JOHNSON for the time period of July 1, 2007 through April 7, 2017, received pursuant to DEA administrative subpoenas, reported JOHNSON filled prescriptions authorized by Dr. Weiss between June 2013 and December 2015.  The prescriptions were for Zaleplon 10mg caplets (Sonata) and Dextroamp-amphetamin 20mg tablets, with the last prescription for 30 Dextroamp-amphetamin 20mg tablets (half the number of tablets as the previous prescriptions) written on August 31, 2015 and filled by JOHNSON on August 31, 2015.

26.     A criminal history check for JOHNSON reported an arrest for ID Theft, Forgery, Financial Transaction Unauthorized, Criminal Possession Financial Device, and Theft committed in June 2017.

New Reporting

27.     Between December 2017 and February 2018, Detective Bynum from the Medina

County Ohio Drug Task Force shared information with your affiant and Task Force

Officer (TFO) Fergon regarding Dr. Howard Weiss.  Detective Bynum received

reliable information from a Source of Information (SOI) in mid-December 2017 that a

person who will be referred to as the "Ohio Patient" for purposes of this affidavit, was

buying prescriptions online for Xanax and Adderall from a doctor in Colorado.  The

Ohio Patient then sold the Xanax he received from those prescriptions at local bars

and kept the Adderall for himself.  The SOI added that the Ohio Patient used the

money he made from selling the Xanax to fund a heroin habit.

28.     Detective Bynum reviewed the Ohio Automated Rx Reporting System (OARRS)

profile for the Ohio Patient and confirmed the Ohio Patient had received prescriptions

from Dr. Weiss, and Dr. Weiss was identified with an address in Colorado.  Detective

Bynum reviewed an OARRS prescribing profile for Dr. Weiss and learned that the

Ohio Patient was the only person Dr. Weiss prescribed to in Ohio during the last two

years.  Detective Bynum confirmed through the Ohio Medical Board that Dr. Weiss

did not and does not currently have a license to practice medicine in Ohio.

29.     Later in 2018, Detective Bynam shared information with your affiant that a

Confidential Source (CS) reported to Detective Bynam s/he had purchased Xanax

(Alprazolam) from the Ohio Patient in the past.  The CS consented to a download of

the CS's phone and Detective Bynam observed text messages between the CS and the

Ohio Patient regarding the Ohio Patient supplying CS1 with Xanax (Alprazolam).

Unfortunately, the CS died of a drug overdose (not related to controlled substances supplied by the Ohio Patient) on September 25, 2018, and therefore was unable to provide additional information on the Ohio Patient's distribution of Xanax (Alprazolam).

30.     On or about October 30, 2018, a Medina (Ohio) Hospital Nursing Operations Manager reported to Detective Bynum concerns regarding Dr. Howard Weiss in Colorado prescribing the Ohio Patient large amounts of controlled substance medications.  The Nursing Operations Manager added that the Ohio Patient's mother stated the doctor in Colorado had not evaluated the Ohio Patient "in years."  Detective Bynum advised your affiant that he also spoke with the Ohio Patient's mother and confirmed that she felt the Ohio Patient was not receiving proper care from Dr. Weiss and Dr. Weiss had not seen the Ohio Patient in years.  The Nursing Operations Manager reported the Ohio Patient had seven emergency room visits to the Medina Hospital in the prior ten days, and supposedly had been to other emergency rooms as well, attempting to obtain additional medication.  The Nursing Operations Manager said the Medina Hospital treating emergency room doctor on October 30, 2018 called Dr. Weiss in Colorado on October 30, 2018 and asked Dr. Weiss about all of the medications prescribed to the Ohio Patient.  The Nursing Operations Manager related that Dr. Weiss told the treating emergency room doctor that he "stands by his rx plan," during that conversation.

31.     On January 19, 2018, a DEA administrative subpoena was served for Prescription Drug Monitoring Program (PDMP) patient summary records of the Colorado State

Board of Pharmacy which includes a patient summary of all dispensed controlled substance prescriptions in Colorado to the Ohio Patient between January 1, 2013 and January 17, 2018.  On January 19, 2018, the Colorado State Board of Pharmacy responded to the DEA subpoena.  Your affiant reviewed the records, and in brief summary, the patient profile reported the Ohio Patient filled prescriptions written by Dr. Weiss for Alprazolam 2mg tablets and Dextroamp-amphetamin 30mg tablets between September 2013 and June 2014 in Colorado.

32.     On September 12, 2018, a Grand Jury Subpoena was served on the Custodian of Records for the State of Ohio Pharmacy Board requesting a patient summary of all dispensed controlled substance prescriptions to the Ohio Patient between January 1, 2014 and the present.  Later in September 2018, the Ohio Pharmacy Board responded to the subpoena by providing the requested records.  Your affiant reviewed the records, and in brief summary, the patient profile reported the Ohio Patient filled prescriptions written by Dr. Weiss for Alprazolam 2mg tablets in July and August 2014; and Alprazolam 2mg tablets and Dextroamp-apphetamin 30mg tablets between May 2017 and August 2018, with the exception of only Alprazolam 2mg tablets in September 2017 and March 2018.

33.     Therefore, the Ohio Patient was receiving prescriptions for Alprazolam 2mg tablets from Dr. Weiss during the time period the SOI and CS reported the Ohio Patient was distributing Xanax (Alprazolam).

### Review of PDMPs by Medical Expert

34.     On or about August 27, 2018, representatives of the Drug Enforcement

Administration retained Dr. Mark Walter, MD as a consulting expert in its

investigation into whether Dr. Weiss participated in the distribution or dispensing of

controlled substances without a legitimate medical purpose or outside the usual

course of professional medical practice in violation of 21 U.S.C. 841, *et seq.*

35.     According to Dr. Walter's *curriculum vitae*, Dr. Walter graduated *summa cum

laude* with a Bachelor of Science degree from Wake Forest University and

subsequently received an M.D. Degree from Wake Forest University School of

Medicine; Dr. Walter participated in the Vanderbilt University Medical Center

Psychiatry Residency Training Program in general adult psychiatry, and more

specifically, participated in areas of concentration, including geriatric psychiatry,

forensic psychiatry, addiction psychiatry and addiction psychiatry clinical rotations.

Dr. Walter is a Diplomate of the American Board of Psychiatry and Neurology and he

is currently the Medical Director of the Campbell County Memorial Hospital in

Gillette, Wyoming.

36.     Dr. Walter was provided Colorado Prescription Drug Monitoring Program

(PDMP) prescribing records that pertain to Dr. Weiss for the time period of January 1,

2015 through September 6, 2018, and Ohio PDMP dispensed records that pertain to

the Ohio patient for the time period January 1, 2014 through mid-September 2018, to

preliminarily determine whether Dr. Weiss's prescribing was pursuant to a legitimate

medical purpose or within the usual course of professional medical practice. On May

23, 2019, Dr. Walter provided the following observations regarding the prescribing practices of Dr. Weiss:

"***At the request of your office, I have undertaken a review of the provider PDMP for Dr. Howard Weiss, a psychiatrist who maintains a practice location in Greenwood Village, CO. The purpose of this review is to screen for patterns of controlled substance issuances that may be suggestive of prescribing outside of the usual course of medical practice and/or without a legitimate medical purpose. Here, any positive findings are based upon a reasonable medical probability, with my opinion being informed by my review of the provider PDMP. To the extent made possible by this data set, I will provide an opinion about whether a course of prescribing could have been pursuant to a legitimate medical purpose in the cases identified in this report.

PROVIDER BACKGROUND

Dr. Weiss maintains a website which indicates that he has been in the practice of Psychiatry for 33 years and that he is a diplomate of the American Board of Psychiatry and Neurology. His home page makes several announcements about Dr. Weiss's practice, each of which would be a rarity in modern Psychiatry.  The first of these is that *"I am readily available for my patients, 24 hours a day, 7 days a week, holidays included, no matter where I am in the world."* He also states that he doesn't use an answering service and that he provides patients with his personal phone number. Dr. Weiss goes further and states, *"I am always on-call for my patients because I believe that this is the proper way to practice Psychiatry."* While it is entirely up to Dr. Weiss to establish the nuances of his private practice, he has adopted a communication strategy with patients which blurs the customary doctor-patient boundaries in Psychiatry (i.e., providing patients with his personal phone number), which eschews the notion of work-life balance in Medicine (i.e., being on call continually and available at all hours), and which a reasonable psychiatrist would not view as the usual or "proper" way to practice. Dr. Weiss also states that he is connected to patients in *"all parts of the United States and the world"* by telephone and Skype. This is an interesting assertion, as Dr. Weiss' resume – which he also makes available to patients on his website – indicates that he only holds medical licenses in Virginia, New Jersey and Colorado.

Dr. Weiss also reveals on his website homepage that he makes *"house calls"* on a routine basis, limited to within a 100-mile radius from his office. This again is a rarity in modern mental health, and it is a practice which is highly discouraged. Here, I will strongly assert that a reasonable Psychiatrist would understand the dangers associated with "house calls" and would never consider engaging in such a practice. The most obvious peril is that "house calls" open the psychiatrist up to accusations, ranging from boundary crossing to impropriety to sexual misdeeds. The reasonable Psychiatrist would also understand that if a psychiatrist who chooses to provide "house calls" is ever accused of an unsavory action, they are already standing on rather indefensible ground, because they chose to put themselves in a position that is viewed as high-

risk and unnecessary in modern mental health. As a case in point a mental health professional – a psychologist in this case – who practiced in Wyoming was recently sent to prison based upon allegations of rape that emerged in the context of his provision of at-home "psychotherapy" services to a female patient. His position, as I indicated above, was hard to defend. A reasonable psychiatrist – or psychologist – would view this willingness to provide psychiatric "house calls" as a problem with boundaries in professional practice.

Dr. Weiss, after indicating on his website that he stays *"up to date on the very latest scientific research findings in my field,"* adds that he is versed in both pharmacologic an psychotherapeutic interventions for a variety of psychiatric conditions, including ADHD, anxiety and phobias. Dr. Weiss appears to place a strong emphasis on non-pharmacologic interventions as opposed to pharmacologic interventions. In fact, he writes, *". . . I will implement treatment with medication only after all non-pharmacologic strategies have been assessed thoroughly."*

Information provided to the public on the Colorado Department of Regulatory Agencies (DORA) website reveals that Dr. Weiss has had prior actions against his medical licenses. In April 1995, he was convicted of mail fraud, a felony. These charges stemmed from his submission of false and fraudulent claims for patient services to third-party payers. He was specifically accused of "upcoding." The Virginia Board of Medicine suspended his license in April 1995, soon after his conviction. A Surrender Order was entered by the New York Medical Board in 1997, after Dr. Weiss was charged with professional misconduct, in reference to his mail fraud conviction. The Findings of Fact in the New York Board order reveal that Dr. Weiss was sentenced to 3 years of probation (including 180 days of home detention), fees, and the requirement that he repay over $35,000.00 in restitution. The Virginia Board of Medicine re-instated Dr. Weiss' medical license in October 1995, albeit with indefinite probation. A diplomate search on the American Board of Psychiatry and Neurology website reveals that Dr. Weiss has an active ABPN certification. He was initially board-certified in 1987 and is "grandfathered," meaning that his certification is not time-limited and is not subject to the maintenance of certification requirements or re-certification requirements that have been imposed on every ABPN diplomate since October 1994.

GENERAL OBSERVATIONS

My review of the provider PDMP for Dr. Weiss uncovered several patterns of unusual controlled substance prescribing behavior. The first of these is a clear preference for prescribing high-dose ranges of the DEA Schedule II controlled substance Adderall (trade name for mixed amphetamine salt) at 60-150mg/day and high-dose ranges of the DEA Schedule IV controlled substance Xanax (trade name for alprazolam) at 6-30mg/day. For the benefit of the reader, I have provided in APPENDIX A, at the end of this report, prescribing guidelines by indication, for the controlled substance medications which appear frequently in Dr. Weiss' provider PDMP. Dr. Weiss also demonstrates a prescribing preference for immediate-release Adderall, amongst stimulant medications; he demonstrates a prescribing preference for Xanax, amongst sedative/anxiolytic medications. Dr. Weiss also exhibits a tendency to prescribe high dosage units of controlled substances – including Adderall and Xanax – which increases the *societal*

*impact* of any drug diversion that may occur. He also regularly prescribes Ambien, a DEA Schedule IV hypnotic, at 10mg po qhs to women, despite the FDA advisory against this practice; moreover, he frequently prescribes this dosage to women, in conjunction with benzodiazepines, controlled substance sedatives. My review also informed me that Dr. Weiss regularly prescribes hypnotics and benzodiazepines in conjunction with Adderall. The most frequently occurring drug combination prescribed, according to his practitioner PDMP, is Adderall and Xanax. With several patients, Dr. Weiss has taken the rare step of prescribing methamphetamine, another DEA Schedule II controlled substance. In fact, outside of this review, I have never witnessed – or so much as heard of – a psychiatrist prescribing methamphetamine to an adult patient. This practice alone appears to be outside of the usual course of professional practice and without a legitimate medical purpose.

## GENERAL STATEMENTS ABOUT PANIC DISORDER

The term "panic attack" is not synonymous with the diagnosis "panic disorder." Panic attacks can occur under a variety of conditions, including states absent a diagnosable psychiatric illness. They can occur in cardiac disease states (e.g., arrhythmias and valve disease), endocrine disease states (e.g., thyroid disease), in states of substance intoxication (e.g., caffeine, amphetamine, cocaine, MDMA), in states of substance withdrawal (e.g., alcohol and benzodiazepine withdrawal), in states of high psychological stress and for no apparent reason at all. Having a single or even multiple panic attacks, in the absence of other behavioral adjustments, does not meet criteria for the diagnosis of "panic disorder." This is why the *Practice Guideline for the Treatment of Patients with Panic Disorder 2nd Ed.* published by the American Psychiatric Association (APA) recommends a thorough evaluation for patients with panic. This evaluation should include a thorough history, including substance abuse history and general medical history. Appropriate steps to evaluate for medical causes of panic can include an electrocardiogram, a referral to Cardiology (if warranted), and thyroid screening (i.e., TSH). The Practice Guideline encourages the psychiatrist to consider both pharmacologic and psychotherapeutic interventions. The psychotherapeutic interventions with the strongest support are cognitive behavioral therapy (CBT) and exposure therapy. Concerning medication treatments, the Practice Guideline observes that…

> *The use of a selective serotonin reuptake inhibitor (SSRI), serotonin-norepinephrine reuptake inhibitor (SNRI), tricyclic antidepressant (TCA), or cognitive-behavioral therapy (CBT) as the initial treatment for panic disorder is strongly supported by demonstrated efficacy in numerous randomized controlled trials. In the absence of a co-occurring mood disorder, monotherapy with a benzodiazepine is also an appropriate initial treatment.*

Later, concerning the use of benzodiazepines, the Practice Guideline adds…

> *SSRIs, SNRIs and TCAs are all preferable to benzodiazepines as monotherapies for patients with co-occurring depression or substance use disorders. Benzodiazepines may be especially useful adjunctively with antidepressants to*

20

*treat residual anxiety symptoms. Benzodiazepines may be preferred (as monotherapies or in combination with antidepressants) for patients with very distressing or impairing symptoms in whom rapid symptom control is critical. The benefit of more rapid response to benzodiazepines must be balanced against the possibilities of troublesome side effects (e.g., sedation) and physiological dependence that may lead to difficulty discontinuing the medication.*

The Practice Guideline also offers a helpful table which summarizes the usual therapeutic doses of various SSRIs, SNRIs, TCAs and benzodiazepines. As this report concerns controlled substance prescribing, I will present the information pertaining to the benzodiazepine class.

| BENZODIAZEPINE | DEA Schedule | USUAL THERAPEUTIC DOSE (mg/day) |
|---|---|---|
| **Xanax (alprazolam)** | IV | 2-4 |
| **Klonopin (clonazepam)** | IV | 1-2 |
| **Ativan (lorazepam)** | IV | 4-8 |

I would like to contrast these general recommendations regarding the usual therapeutic dose of Xanax with the FDA labelling for Xanax. Concerning the general "anxiety" indication, the labelling for Xanax specifies a maximum daily dose in adults of 4mg/day, in divided doses. Referencing the Physician's Desk Reference (PDR), for the indication of "panic disorder," the mean doses of 5 to 6mg/day of Xanax are provided, with a specified maximum of 10mg/day, in divided doses. This does not mean that benzodiazepines like Xanax are the preferred treatment for anxiety or for panic disorder. The Practice Guideline referenced above makes clear that SSRI's and SNRI's are also first-line treatments and are the preferred agents in certain circumstances (mood disorders and substance abuse history). Xanax remains the most prescribed benzodiazepine (BZD), not because it is viewed as being superior to other BZD's, but because it is frequently requested by patients and because it continues to be prescribed heavily by non-psychiatric, primary care providers. At the same time that alprazolam is the most widely prescribed benzodiazepine, it is also the most misused benzodiazepine. Over the years, psychiatrists – especially those who treat addiction – have come to view Xanax as an increasingly problematic drug. This is because we have come to learn that Xanax indeed has a very high misuse liability, that its pharmacology results in greater reward reinforcement and more severe withdrawal (including rebound anxiety) and that it has been implicated in roughly one-third of intentional overdoses. Xanax is also more toxic than other benzodiazepines in overdose. Some authors suggest that SSRI's and SNRI's should always be considered the first-line treatments for anxiety disorders and that benzodiazepine medications, if used at all, be used for a short duration to provide symptom alleviation in the window before the antidepressants become effective. The same authors indicate that if Xanax is chosen as treatment, it should only be prescribed in the extended-release formulation for short duration, and only to those with no prior substance

abuse history. Although the initial labelling for Xanax in panic disorder specifies a maximum of 10mg/day, it is rare to see a psychiatrist prescribe Xanax at that level.

Here, I should emphasize that there are also medication causes of heightened anxiety and panic. A common medication cause are benzodiazepines themselves. Benzodiazepines bind to the gamma-aminobutyric (GABA) receptor and increase GABA transmission, in a manner similar to alcohol. GABA transmission is the "braking" mechanism for the central nervous system, and this explains the sedative and anxiolytic effect of benzodiazepines. The primary tolerance or accommodation mechanism to benzodiazepines in the central nervous system is an amplifying of the glutamate or "acceleration" system, which also occurs in the development of tolerance to alcohol. It is this excitatory glutamate system that is responsible for the acute withdrawal phenomena (e.g., tremor, autonomic excitability, seizures) in alcohol-tolerant or benzodiazepine-tolerant states. As indicated earlier in this section, Xanax use can result in more severe withdrawal than other dose-equivalent benzodiazepines. One of the more common benzodiazepine withdrawal symptoms happens to be rebound anxiety, and this often occurs even when other symptoms of acute withdrawal are absent. If benzodiazepine dosing is increased in a given patient, in response to rebound anxiety, their tolerance is further increased, and they are at even greater risk of rebound anxiety. Stimulants, whether caffeine or prescription stimulants, also increase susceptibility to heightened anxiety and panic.

Toxicity can occur with all benzodiazepines. Symptoms of benzodiazepine toxicity include somnolence, confusion, slurred speech, diminished reflexes, ataxia, coma and respiratory depression. Death has been reported with overdoses of alprazolam alone. Common adverse side effects of BZD use include sedation, dysarthria, confusion, in coordination and memory impairment.

GENERAL STATEMENTS ABOUT ATTENTION DEFICIT/HYPERACTIVITY DISORDER (ADHD)

The diagnosis of ADHD in children, for whom the diagnostic criteria were initially crafted, is challenging enough, as there are a number of diagnostic confounders in this population. These can include developmental disorders, mood disorders, thought disorders, learning disabilities, anxiety disorders and the effects of a poor home environment. The clinician's task is made somewhat easier, because the clinician generally receives input from multiple sources, including parents and teachers. In young children, the confounding specter of substance abuse is generally not present. Roughly 50% of children lose the signs and symptoms of ADHD (with a preferential loss of hyperactivity) as they mature into adulthood.

The diagnosis of ADHD in adults is considerably more challenging because of the non-specific nature of the symptom of inattention, because of patient reluctance to follow diagnostic criteria and because of the occurrence of substance abuse and drug-seeking

behaviors.  Inattention is a fairly nonspecific symptom and occurs commonly in other psychiatric disorders, to include mood disorder, anxiety disorders, thought disorders, substance use disorders and obsessive-compulsive disorder (OCD). Therefore, the diagnosis of ADHD as a syndrome of primary inattention in adults requires a careful screening for these other disorders. Unfortunately, in many offices, the *de facto* criteria for adult ADHD is either a history of receiving the diagnosis from another provider or having the patient complete a short self-assessment screening survey which could be suggestive. The problem with the self-assessments often provided to patients concerned about ADHD is that they have perfect sensitivity. Consider, for example, the 6-question Adult ADHD Self-Report Scale (ASRS) published by the World Health Organization (WHO). This self-screener asks 6 questions which can be easily answered with a "positive" result by anyone invested in having the diagnosis of ADHD or invested in being prescribed a stimulant medication. That is to say that the "correct" answers to the questionnaire are self-evident, and the results and conclusions can be swayed accordingly. I have seen many cases where primary care physicians include a copy of the ASRS results or a similar self-screener in the patient chart as evidence of ADHD and justification for prescribing stimulant medications to the patient. In cases where adult ADHD, involving inattention not clearly linked to another disorder or to substance abuse, is suspected, it is often helpful to refer the patient for neuropsychiatric testing for clarification of any attention problems.

In cases where a syndrome of primary inattention is identified in an adult, stimulant medications are not always warranted. Some patients cope well with just simple behavioral interventions (e.g., use of a day planner). Some patients respond adequately to use of non-stimulant medications (e.g., bupropion or atomoxetine). In cases where patients do not adequately respond to these treatments, reasonable doses of a stimulant medication will usually suffice. Concerning the use of immediate-release Adderall, the medication database Micromedex proposes that the initial dosage be 5mg po once or twice daily, with the titration proceeding at 5mg increments at weekly intervals until an optimal response is achieved. Micromedex specifies that **doses of Adderall IR greater than 40mg/day are rarely needed**.  Similarly, the Centers for Medicare and Medicaid Services (CMS) reports the maximum dose of Adderall IR as 40mg per day, adding that ***"only in rare cases will it be necessary to exceed a total of 40mg per day."***

Concerning Adderall XR, Micromedex identifies the **usual dosage as 20mg po qam**.  CMS also reports the recommended dose as 20mg once a day. The PDR reminds us that during adult ADHD trials, there was not adequate evidence that doses greater than 20mg/day ER capsules conferred additional benefit. Psychopharmacology expert Dr. Steven Stahl also writes that the **maximum dose of Adderall XR is generally considered to be 30mg/day**.

According to the Micromedex database, the labeling for methylphenidate IR (a DEA schedule II stimulant) in the treatment of ADHD allows for a **dosage range of 10 to 60mg/day**, divided two to three times daily. The PDR identifies the average effective dose range for adults as 20 to 30mg per day, and it makes clear that the **maximum is 60mg/day**

**per FDA-approved labeling**.  As it concerns methylphenidate ER (e.g., Concerta), the PDR recommends a **starting dose of 18 to 36mg po qam** in non-geriatric adults and specifies a **maximum of 72mg/day**.

This data is provided to give the reader some sense of the manner in which these medications are usually prescribed. It should be a rare event to see Adderall IR prescribed at greater than 40mg/day; Adderall XR at greater than 30mg/day and methylphenidate IR at greater than 40mg/day. Infrequent excursions outside of these ranges may be seen; however, these excursions should not be a pattern of practice. Moreover, it should be a cause for concern, anytime that methylphenidate ER is prescribed at doses greater than 72mg/day or Vyvanse is prescribed at greater than 70mg/day.

In 2010, the Colorado Medical Board updated its *Rule 210 – Unprofessional Conduct Relating to the Prescribing of Stimulant Drugs* to address unapproved, off-label uses of prescription stimulants. These unapproved uses are enumerated in the update (effective date 10/15/2010):

> *Prescription of stimulant drugs (amphetamine or sympathomimetic amine drugs designated as Schedule II controlled substances) is not acceptable for purposes of diet control, increasing work capacity to combat the normal fatigue associated with any endeavor, or to chemically induce euphoria.*

In 2016, the Colorado Medical Board updated Rule 210 to clarify its stance on the use of stimulant medications in treatment-resistant depression (TRD). The effective date is 7/16/2016 on this update:

> *Prescribing of stimulant drugs (amphetamine or sympathomimetic amine drugs designated as Schedule II controlled substances) shall be in accordance with generally accepted standards of medical practice including, but not limited to, the treatment of severe or treatment-resistant depression. Prescribing of stimulant drugs is not acceptable for purposes of diet control for weight loss, increasing work capacity to combat the normal fatigue associated with any endeavor, or to chemically induce euphoria.*

The Colorado Medical Board's inclusion of TRD as an acceptable off-label use of stimulant medications merits a discussion about how treatment-resistant depression is generally managed. Concerning this matter, I will assert that the off-label use of stimulant medications for TRD should be a rare occurrence. The definition of "treatment-resistant depression" has not been standardized, though it generally refers to a major depressive episode that has not adequately responded to two *trials* of antidepressant monotherapy. Each antidepressant "trial" should be defined with an adequate duration of exposure to the antidepressant medication, at a dose where most individuals would be expected to demonstrate at least a partial response to the medication (*i.e.,* an antidepressant trial

24

should be long enough and high enough that it would be expected to produce a response in a depressed individual). If an individual is not exposed to a valid trial of an antidepressant medication, then that medication should not be considered as a "trial," when deciding if a patient's depression can be identified as "treatment-resistant." When a patient has not responded to a valid trial of medications, there are a number of commonplace, non-controlled-substance options that a provider may invoke. The simplest option is a medication switch, which may involve a switch to an antidepressant from another pharmacologic class (e.g., from an SSRI to an SNRI, from an SNRI to an SSRI or from an SSRI/SNRI to a TCA). Another option that may be considered is an antidepressant augmentation, whereby another medication is used alongside an existing antidepressant to boost overall treatment response. There a number of commonly used and non-controlled augmenting medications, to include bupropion (a dopamine re-uptake inhibitor), lithium, mirtazapine (a novel antidepressant), aripiprazole (FDA-approved for adjunctive treatment of major depressive disorder), buspirone, and liothyronine. The non-controlled medication Symbyax has been approved by the FDA for TRD. Providers can also refer patients for non-medication adjunctive treatment strategies to include individual psychotherapy, support groups, electroconvulsive therapy (ECT), transcranial magnetic stimulation (TMS) and vagal nerve stimulation (VNS). Because of the ready availability of these non-stimulant medication options (including some with FDA approval) and non-medication options, providers have ample reason to avoid unnecessary and off-label use of stimulant medications for TRD.

As with sedative medications, there are toxicity syndromes associated with stimulant medications. Manifestations of stimulant overdose may include hyperactivity, diaphoresis, flushing, mydriasis, nausea, vomiting, abdominal pain, hypertension, palpitations, chest pain, headache, hyperventilation, confusion, hyperthermia, cardiac arrhythmia, myocardial infarction, aortic dissection, stroke, sudden cardiac death, psychosis and seizures. Common adverse side effects of stimulants include increased blood pressure, weight loss, headaches, loss of appetite, anxiety and mood swings.

## CASE PRESENTATIONS

What follows in this reports is a review of select patient cases, based only upon PDMP data, for the purpose of identifying any patterns of prescribing behavior which, within a reasonable medical probability, fall outside of the usual course of psychiatric treatment and/or occur without a legitimate medical purpose. No patient identifiers are included in this report. Instead patient initials are used. In cases where different patients appearing on the PDMP have the same initials, the next letter of the name will be added for clarification. Cases are organized by the type of unusual prescribing practice or pattern observed. The patient cases which generate the greatest concern for patient safety and/or possible diversion are listed in red type.

UNUSUAL PRESCRIBING PATTERN #1:  The Use of Methamphetamine in Adult Patients

Although Desoxyn (trade name for methamphetamine) has FDA approval for ADHD with hyperactivity in special cases (discussed below) and for exogenous obesity, most psychiatrists will never prescribe methamphetamine in the course of their careers. There are several factors for this, not least of which is methamphetamine's position in the public consciousness as a drug of abuse and its addictive potential. Another reason is that the FDA labelling for the ADHD indication is quite restrictive and does not include treatment of adult ADHD. In fact, prior to performing this review, I was not personally familiar with any other case of a psychiatrist prescribing methamphetamine in an adult.

The FDA labelling on methamphetamine is quite strict, as concerns both the ADHD indication and the exogenous obesity indication. The FDA label does not include treatment of adult ADHD. Instead, it limits treatment to children, over the age of 6 years, with certain behavioral features and as part of a more comprehensive treatment for those children. According to the FDA label…

> *DESOXYN tablets are indicated as an integral part of a total treatment program which typically includes other remedial measures (psychological, educational, social) for a stabilizing effect in children over 6 years of age with a behavioral syndrome characterized by the following group of developmentally inappropriate symptoms: moderate to severe distractibility, short attention span, hyperactivity, emotional lability, and impulsivity. The diagnosis of this syndrome should not be made with finality when these symptoms are only of comparatively recent origin. Non-localizing (soft) neurological signs, learning disability, and abnormal EEG may or may not be present, and a diagnosis of central nervous system dysfunction may or may not be warranted.*

The FDA label for exogenous obesity is also very restrictive and limits Desoxyn to use *"as a short-term (i.e., a few weeks) adjunct in a regimen of weight reduction based on caloric restriction, for patients in whom obesity is refractory to alternative therapy, e.g., repeated diets, group programs, and other drugs."*  The FDA also cautions that *"methamphetamine should not be given to patients who are in an agitated state or who have a history of drug abuse."*

The DEA's *Drug & Chemical Evaluation Section* has produced a monograph on methamphetamine. Under the licit uses of the drug, the DEA acknowledged in this data sheet that *"Desoxyn has very limited use in the treatment of obesity and attention deficit hyperactivity disorder."*

Based upon the misuse liability of methamphetamine, the restrictions of the label, and the availability of other prescription stimulant medications, it is my opinion that there is

never an appropriate use of methamphetamine in adults. Moreover, there is no appropriate justification for prescribing methamphetamine in a patient with a known addiction history, regardless of the intended indication. When Desoxyn is used in children over 6 years, the usual effective dose is 20 to 25mg/day, typically given in two divided doses.

### Patient B.E.

This case is highly unusual, in that Dr. Weiss has opted to prescribe a patient **methamphetamine** (trade name Desoxyn). In this case, Dr. Weiss also found it appropriate to prescribe the patient **alprazolam 12mg/day** (see fill date 6/18/2018). One could reasonably expect that methamphetamine would aggravate an anxiety condition and that high-dose alprazolam would cause problems with alertness and attention. Based upon the concerns for methamphetamine prescribing mentioned earlier in this paper and Dr. Weiss' use of high-dose Xanax in this patient, this prescribing pattern is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

### Patient Jo.Fa.

This is another case in which Dr. Weiss takes the very unusual step of prescribing **methamphetamine** to a patient. Dr. Weiss also prescribes **alprazolam 6mg/day**. The concerns here are identical to those for patient B.E., and this pattern of prescribing is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

### Patient Wa.Johnc.

This is another case in which Dr. Weiss found it appropriate to prescribe a patient **methamphetamine**, in addition to two benzodiazepine medications. Dr. Weiss repeatedly prescribed to patient W.J. methamphetamine 25mg/day, alprazolam 2mg/day and flurazepam 30mg/day.  One could reasonably expect that methamphetamine would aggravate an anxiety condition and that the combination of alprazolam and flurazepam would cause problems with alertness and attention, due to their cumulative CNS depression. For the same reasons discussed under the preceding two cases, this pattern of prescribing is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

### Patient Wa.Johna.

On the PDMP there is another patient with a similar – but different – name to whom Dr. Weiss also prescribed **methamphetamine**, concurrently with Xanax. For the same reasons discussed under the other cases where Dr. Weiss co-prescribed methamphetamine and a sedative, this prescribing pattern is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

**Patient Sa.Pr.**

In this case, Dr. Weiss again prescribes a patient methamphetamine, in conjunction with Xanax. Here, he writes the patient for **methamphetamine 20mg/day and Xanax 8mg/day**. For the same reasons given in multiple cases above, this prescribing pattern is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

**Patient Da.St.**

Dr. Weiss prescribed to patient Da.St. the combination of **methamphetamine 20mg/day** and **Xanax 3mg/day**. Every patient case presented thus far under the use of methamphetamine in adults has involved the co-prescribing of Xanax. For the same reasons given in all of the preceding cases, this prescribing pattern is, within a reasonable medical probability, outside the usual course of professional practice and without a legitimate medical purpose.

**Patient P.V.**

This is yet another case that exemplifies Dr. Weiss' willingness to prescribe methamphetamine to adults, his tendency to prescribe high-dose stimulants, and his tendency to prescribe high-dose stimulants in combination with sedatives (most frequently Xanax). On 8/02/2018, Dr. Weiss authorized **methamphetamine 10mg/day** and **Xanax 6mg/day** for patient P.V. Dr. Weiss altered this regimen, and began to prescribe to the patient a combination of **Adderall XR 60mg/day, Adderall 90mg/day and Xanax 8mg/day**. Summing the extended-release and immediate-release forms of Adderall, this provided the patient with a total of **150mg of mixed amphetamine salts per day**. This cumulative dose of mixed amphetamine salts should be viewed as highly irregular and hazardous. This manner of prescribing clearly puts the patient at risk for stimulant toxicity; within a reasonable medical probability, it falls outside of the usual course of professional practice and is without a legitimate medical purpose.

UNUSUAL PRESCRIBING PATTERN #2:  High-dose Stimulant Medications with High-dose Sedatives

Based upon my review of the PDMP, Dr. Weiss frequently prescribes to patients a combination of a DEA Schedule II stimulant, with a marked preference for mixed amphetamine salts, with a DEA Schedule IV sedative/anxiolytic, with a marked preference for alprazolam. He also demonstrates a clear pattern of prescribing high doses of stimulants and sedative/anxiolytics, even when prescribed concurrently.  This combination is worrisome, due to the relatively high dosages of each controlled substance medication and due to their competing effects. It is interesting that Dr. Weiss routinely chooses Xanax as an anti-anxiety agent, rather than a benzodiazepine with less misuse potential and with less potential for rebound anxiety. Even if one assumed that there was a patient with severe panic disorder who did not respond to the first-line treatments of SNRIs and SSRIs, who did not respond to any benzodiazepine with less misuse liability

and who did not respond adequately to lower doses of alprazolam, it would seem very ill-advised to start the same patient on a stimulant medication. In all of these cases, it is reasonable to question if the patient's anxiety was due primarily to either rebound anxiety as a consequence of high-dose Xanax use or to the use of high-dose stimulant or to a combination of these two factors. Each of these medication conditions may cause a patient to appear treatment refractory.

**Patient C.A.**

This case illustrates the most common controlled substance prescription combination seen on the provider-specific PDMP:  the concurrent use of Adderall and Xanax. In this case, Dr. Weiss routinely prescribed patient C.A. the combination of #90 alprazolam 2mg tablets, corresponding to **Xanax 6mg/day** and #90 Adderall 20mg tablets, corresponding to **Adderall 60mg/day**. The PDMP does not include the provider's intended treatment indications. Each of these medication conditions may have caused the patient to appear treatment refractory. It would also be interesting to review Dr. Weiss' indication for using Adderall in this patient. If it was used for the FDA-labeled indication of "ADHD," one would rightly question the impact of high-dose Xanax on an individual's attention capacity and how this would impact the diagnosis of an attention-deficit syndrome. Here I will posit that a reasonable psychiatrist would not routinely prescribe high-dose Xanax, would not routinely prescribe high-dose Adderall and would almost never prescribe high-dose Xanax in combination with a high-dose stimulant medication. These same admonitions will apply to any case discussed hereafter that involves a daily Xanax dose greater than 4mg and a daily Adderall dose greater than 40mg. This manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice.

**Patient K.A.**

This case causes concern, in that Dr. Weiss not only prescribes the patient **Xanax** and Adderall in combination, but because the Adderall dose is so high. On multiple occasions, Dr. Weiss prescribes patient K.A. #90 Adderall 30mg tablets, corresponding to a 30-day supply of medication. This means that the intended dosing for the patient was **Adderall 90mg po qam**. This is over twice the daily maximum recommendation for immediate-release Adderall that is specified by multiple sources (Micromedex, CMS, PDR and Stahl). In my opinion, this dosing is excessive, places the patient and undue risk for hypertensive and vascular events and is very difficult to justify medically. This pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient M.A.**

This case, like others, demonstrates Dr. Weiss' tendency to prescribe the combination of a stimulant (Adderall XR or Adderall) and **Xanax**. In many instances, Dr. Weiss prescribed to patient A.M. #90 Adderall 30mg tablets, corresponding to **Adderall 90mg po daily**. When he prescribed Adderall XR to the patient, he did so as #60 Adderall XR 30mg tablets, corresponding to **Adderall XR 60mg po daily**. With either preparation, IR or XR, Dr.

Weiss has prescribed the stimulant for unusual, excessive doses. This pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice.

### Patient D.A.

This case is interesting in that Dr. Weiss has chosen to prescribe a given patient two benzodiazepine medications, clonazepam and temazepam (both DEA Schedule IV), in conjunction with high-dose Adderall. It also demonstrates his willingness to prescribe **high dosage units** of a controlled medication unnecessarily and to prescribe **high-dose benzodiazepine medications on a long-term basis** to a patient. In this case, Dr. Weiss prescribed various benzodiazepines to patient D.A., from 1/23/2015 to 3/17/2018. He frequently prescribed **#240 clonazepam 0.5mg tablets** to the patient, corresponding to 8 tablets per day of the medication. Prescribing this number of clonazepam tablets is ill-advised and unnecessary, considering that clonazepam comes in a variety of tablet sizes, including 0.5mg tablets, 1mg tablets and 2mg tablets. Dosing clonazepam 8 times daily also makes very little sense based upon the pharmacology of clonazepam. Clonazepam has a long time to peak plasma level and a long half-life of elimination. These features make clonazepam a poor medication for "prn" use; however, they do make clonazepam a good candidate for scheduled, bid dosing. There appears to be no clinical utility for providing the patient with #8 clonazepam tablets for daily use, and the risk of diversion is made high by this manner of prescribing the drug. At another point (see PDMP fills for 10/14/2017), Dr. Weiss found it appropriate to prescribe to patient D.A. **#90 clonazepam 2mg tablets and #30 temazepam 30mg tablets**. Temazepam is a sedating benzodiazepine which used to be prescribed commonly for insomnia. In this case, one would question whether the patient's high Adderall dose (immediate-release **Adderall at 60mg po daily**) was contributing to a sleep disturbance. Clonazepam is also a sedating benzodiazepine, and one should question the purpose of prescribing clonazepam with temazepam. At this doses, (i.e., **clonazepam 6mg daily** and **temazepam 30mg daily**), there is a significant risk for **cumulative CNS depression** that puts the patient at unnecessary risk. This manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice.

### Patient R-T.B.

This case is one of the more egregious in the series. Dr. Weiss repeatedly authorized for this patient fills of #120 Adderall 30mg tablets, corresponding to a dosing of **Adderall 120mg po daily**. He also prescribed to the patient #120 alprazolam 2mg tablets, corresponding to **Xanax 8mg po daily**. At first inspection, there appears to be no safe or legitimate medical use for Adderall prescribed in these quantities. The high dosage units for both Adderall and Xanax also increases the impact of any drug diversion that might be taking place. This prescribing pattern is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient E.B.**

This case is also one of the more egregious in the series, and it is fraught with a number of prescribing irregularities. It exemplifies not only Dr. Weiss' tendency to prescribe high-dose Adderall (in doses up to 90mg po daily) and high-dose Adderall XR (in doses up to 60mg daily), but also his tendency to prescribe the stimulant medications in conjunction with benzodiazepine medications and hypnotic medications, and over long periods of time. Dr. Weiss' stimulant prescribing is most pronounced on 4/17/2015, when he issues simultaneous prescriptions for #60 Adderall XR 30mg caps, #90 Adderall 30mg tabs, in addition to #30 Xanax 2mg tablets. This amounts to **90mg of immediate-release Adderall and 60mg of extended-release Adderall** daily. That provides a **cumulative mixed amphetamine salt dosage of 150mg/day**. Not only is this level of amphetamine prescribing for the patient unsafe, but I can imagine no legitimate medical purpose for this type of amphetamine regimen. On 3/15/2017, Dr. Weiss also writes the patient for **#30 oxycodone 10mg tablets**.  This is clearly outside of the scope of medical practice for an outpatient Psychiatry clinic. Dr. Weiss also prescribes the combination of zolpidem ER 12.5mg po daily and clonazepam 4mg/day to patient E.B. There is also evidence that Dr. Weiss permitted **early refills of Adderall** (see prescription fill dates on 2/09/2015 and 2/24/2015). For all of these reasons, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient L.B.**

This is another particularly egregious case in which Dr. Weiss prescribes to a patient high-dose Adderall and high-dose Xanax to a patient, over a considerable period of time, from 1/19/2015 to 9/04/2018. Dr. Weiss prescribed this patient immediate-release **Adderall in doses up to 120mg/day** (see PDMP fill dates 12/30/2016 and 02/02/2017). He typically provided her with #90 Xanax 2mg tablets, corresponding to a 30-day supply of medication. This would allow for **Xanax 6mg/day**. For the same reasons discussed in the preceding cases, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ry.Br.**

This case also illustrates Dr. Weiss' preference for prescribing patients combinations of high-dose Xanax and high-dose Adderall. In this particular case, Dr. Weiss prescribed the patient **Adderall 120mg/day**, in addition to **Xanax 6mg/day**. For the same reasons discussed in the preceding cases, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient P.C.**

This is yet another case demonstrating Dr. Weiss' tendency to write for combinations of Xanax and high-dose Adderall.  The way in which these prescriptions were written

allowed for **Xanax 8mg/day** and **Adderall 90mg/day**. What is most interesting about this case is that Dr. Weiss appeared to write the patient for a **90-day supply of Adderall** on 7/17/2015, as **#180 Adderall 30mg tablets**. Without viewing the actual prescription providing for this release of Adderall, it is difficult to determine what was presented to the pharmacy and how this request was processed by the pharmacy. That stated, the matter of Schedule II prescription refills has been addressed in a 2007 update to the Title 21 Code of Federal Regulations, Part 1306:

>*CONTROLLED SUBSTANCES LISTED IN SCHEDULE II*
>*§1306.12 Refilling prescriptions; issuance of multiple prescriptions.*
>*(a) The refilling of a prescription for a controlled substance listed in Schedule II is prohibited.*
>*(b)(1) An individual practitioner may issue multiple prescriptions authorizing the patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided the following conditions are met:*
>>*(i) Each separate prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice;*
>>*(ii) The individual practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled immediately) indicating the earliest date on which a pharmacy may fill each prescription;*
>>*(iii) The individual practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk of diversion or abuse;*
>>*(iv) The issuance of multiple prescriptions as described in this section is permissible under the applicable state laws; and*
>>*(v) The individual practitioner complies fully with all other applicable requirements under the Act and these regulations as well as any additional requirements under state law.*
>*(2) Nothing in this paragraph (b) shall be construed as mandating or encouraging individual practitioners to issue multiple prescriptions or to see their patients only once every 90 days when prescribing Schedule II controlled substances. Rather, individual practitioners must determine on their own, based on sound medical judgment, and in accordance with established medical standards, whether it is appropriate to issue multiple prescriptions and how often to see their patients when doing so.*

This is generally facilitated in practice by writing a prescription for a 30-day supply of the Schedule II medication, indicating no refills and by two additional written prescriptions, each for a 30-day supply, with no refills and a specific mention of "DO NOT FILL BEFORE [date]." In this manner, a patient may pick up three serial fills of the medication, each one month apart, to cover a total of 90 days. It appears that Dr. Weiss has written his prescriptions for both Adderall and Xanax, such that #180 dosage units are

released at once. This creates more of a diversion hazard, then when a single-month supply of medication is dispensed from the pharmacy.  The pattern of prescribing in this case, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

### Patient An.Ci.

This is yet another case illustrating Dr. Weiss' strong tendency to prescribe a combination of high-dose Adderall and high-dose Xanax. In this case, he provided the patient with prescriptions that would allow for **Xanax 8mg/day** and **Adderall 120mg/day**. For the reasons provided in the above cases, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

### Patient Ja.De.

This is yet another case, in which Dr. Weiss prescribes high-dose Xanax to a patient over a long term, and in conjunction with the muscle relaxant **carisoprodol**.  Here I will restate that the prescribing of muscle relaxants in an outpatient Psychiatry practice is an oddity. In the course of providing long-term prescriptions of high-dose Xanax to patient Ja.De., Dr. Weiss escalated his dose of **Xanax to 12mg/day**. Not only is prescribing Xanax at this level ill-advised, as it puts the patient at risk of severe CNS depression and severe Xanax withdrawal, but the co-prescribing of carisoprodol and high-dose Xanax further increases the expected CNS depression. Based upon the dosing of Xanax achieved and the concurrent use of carisoprodol, Dr. Weiss' prescribing of these sedating medications is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose. Interestingly, Dr. Weiss started patient Ja.De. on **Adderall 90mg/day** months after he started the patient on the combination of Xanax and carisoprodol. Here, one would rightly ask if Mr. Ja.De. developed attention problems as a result of the sedating medications that he was being prescribed.

### Patient G.E.

The case of patient G.E. is another illustration of Dr. Weiss' frequent tendency to prescribe high-dose stimulant medication with high-dose benzodiazepine medication. Here, he repeatedly prescribed to the patient **Adderall XR 60mg/day**, in addition to **clonazepam 8mg/day**. The manner in which he prescribed clonazepam is also a matter of concern. On multiple occasions, Dr. Weiss authorized fills for **#240 clonazepam 1mg tablets**. Here, I will apply the same concerns and cautions that I provided in the discussion for patient D.A., regarding clonazepam tablet size and dosage amount. For the reasons stated in the preceding cases, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ja.Fi.**

This is another patient to whom Dr. Weiss found it appropriate to prescribe a combination of high-dose stimulant medications and Xanax. What stands out in this case is the manner in which Dr. Weiss prescribed Adderall to the patient. He regularly prescribed **#120 Adderall 10mg tablets and #30 Adderall XR 20mg tablets** to patient Ja.Fi. Not only is the total daily dose of mixed amphetamine salts high, at 60mg/day, but Dr. Weiss appears to unnecessarily write for **high dosage units of immediate-release Adderall**. The dispense amount of immediate-release Adderall, marked as a 30-day supply, would mean that the patient has #4 Adderall 10mg tablets at their disposal each day. Normally, a physician would get around this matter by either prescribing a larger tablet size of Adderall, with a smaller dispense amount, or they would abandon immediate-release Adderall for extended-release Adderall. In this case, Dr. Weiss appears to follow no particular prescribing strategy, as he prescribes both immediate-release and extended-release Adderall, in addition to **#120 alprazolam tablets monthly**. For the same reasons cited previously, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient L.F.**

This is yet another case in which Dr. Weiss found it appropriate to prescribe Adderall and Xanax concurrently. Here, the **Xanax dosage peaked at 10mg/day**, while the patient was also prescribed **Adderall 60mg/day**. This pattern of prescribing high-dose stimulants with high-dose sedatives, within a reasonable medical probability, outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient J.H.**

This case is concerning, as Dr. Weiss found it appropriate to prescribe patient J.H. a combination of high-dose Adderall, Xanax and the stimulant **modafinil** (trade name Provigil), concurrently. Modafinil is FDA-approved for sleepiness associated with narcolepsy, obstructive sleep apnea, and shift work sleep disorder. It would not be considered unusual for a psychiatrist to prescribe modafinil for any of these indicated condition; however, a reasonable psychiatrist would not pair modafinil with mixed amphetamine salt and sedating benzodiazepine medications as Dr. Weiss has done. As an example, on 11/10/2015, Dr. Weiss prescribed to patient J.H. a combination of **alprazolam 3mg/day**, **modafinil 200mg/day** and **Adderall 90mg/day**. This combination does not make sense clinically, because if Dr. Weiss were treating sleepiness with modafinil, then simultaneously prescribing the sedative Xanax seems to defeat that purpose. A reasonable psychiatrist would also be too concerned about the cumulative stimulant effects of the medications to co-prescribe high-dose Adderall and modafinil. In June of 2016, Dr. Weiss began to prescribe to patient J.H. **clonazepam**, which is even more sedating than alprazolam. By July 2017, the dosing of **clonazepam escalates to 6mg/day**, and this is prescribed concurrently with **Adderall 120mg/day**. For the reasons outlined in this section, Dr. Weiss' pattern of prescribing to patient J.H., within a

reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient S.H.**

This is yet another case demonstrating Dr. Weiss' proclivity for prescribing Xanax in conjunction with high-dose Adderall. On 3/31/2018, Dr. Weiss prescribed patient S.H. **Adderall 90mg/day** and **Xanax 3mg/day**. In the case of patient S.H., Dr. Weiss again repeats his common prescribing pattern of combining a sedative with high-dose DEA Schedule II stimulants. This pattern, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient A.H.**

On the current PDMP, Dr. Weiss begins to prescribe **a combination of Xanax 4mg/day and Valium 20mg/day** to patient A.H. on 12/24/2014. Months later, **Adderall 90mg/day** appears on the PDMP, with an initial issuance date of 3/24/2015. There **were no earlier entries for Adderall showing any type of titration** of this medication. This case demonstrates again, Dr. Weiss' preference for prescribing high-dose stimulants in conjunction with sedatives. This pattern, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient P.H.**

This case is similar to that of patient A.H. in that Dr. Weiss prescribes to patient P.H. a total of **two benzodiazepine medications** – clonazepam and Xanax – months before initiating a high-dose stimulant medication. Dr. Weiss issued prescriptions for clonazepam 2mg/day and Xanax 2mg/day on 6/02/2015. On 10/09/2015, Dr. Weiss issued an **initial prescription for Ritalin 60mg/day**. As was the case with patient A.H., there was **no evidence of a stimulant titration** on the PDMP. This prescribing pattern, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient E.H.**

This is yet another case which showcases Dr. Weiss' routine practice of prescribing high-dose stimulant in conjunction with a sedative/anxiolytic medication. Here, he prescribes patient E.H. **immediate-release Adderall at doses up to 80mg/day**, in addition to **clonazepam 6mg/day**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient B.K.**

This case offers another example of a very concerning prescribing pattern in which Dr. Weiss prescribes a patient a very high dose of a stimulant, in addition to multiple sedatives, concurrently. Here, he prescribes a female patient **Xanax 8mg/day,**

**clonazepam 4mg/day, Ambien 10mg/day and Adderall 120mg/day**. In this case, the patient is put at risk of cumulative CNS depression and sedative toxicity by the combination of Xanax, clonazepam and Ambien. In another section of this report, I have also discussed the FDA advisory regarding the prescribing of Ambien to female patients. Patient B.K. is also put at risk of stimulant toxicity, based upon the amount of Adderall prescribed to her. This pattern of prescribing is very alarming and, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Ky.Ke.

Here, Dr. Weiss prescribes patient a combination of **Adderall 120mg/day** and **alprazolam 8mg/day**. There appear to be **early refills of Adderall on 6/30/2015 and 9/23/2015**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient P.K.

This is another case illustrating Dr. Weiss' preference for prescribing high-dose Adderall in combination with Xanax. Here, he repeatedly prescribes **Adderall 90mg/day** and **Xanax 8mg/day**. There appears to be an **early refill of Adderall on 8/23/2018**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Ke.Ke.

This case is another example of Dr. Weiss' willingness to prescribe high-dose stimulants in conjunction with multiple benzodiazepine medications. He prescribed to patient Ke.Ke. in this manner over a long period of time. By early 2018, this combination included. **Adderall 60mg/day, Adderall XR 60mg/day, clonazepam 4mg/day and alprazolam 4mg/day**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient J.K.

This case is interesting in that Dr. Weiss prescribed Xanax to patient J.K., beginning in September 2014. In March 2018, after **prescribing Xanax to patient J.K. for more than three years**, Dr. Weiss introduces an **initial prescription for methylphenidate 40mg/day, without any evidence of a titration on the PDMP**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient S.K.**

This is yet another case in which Dr. Weiss found it appropriate to prescribe high-dose Adderall in conjunction with multiple sedative drugs, concurrently. At the same point in time, Dr. Weiss prescribes patient S.K. a combination of **Adderall 80mg/day, alprazolam 8mg/day and clonazepam 2mg/day**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient M.K.**

This is another case in which Dr. Weiss prescribes to a patient a combination of high-dose stimulant and a high-dose sedative. It is also a reminder that whenever Dr. Weiss prescribes a stimulant other than Adderall, he frequently uses a higher dose range of medication than most would recommend. In this case, he prescribes patient M.K. a combination of **methylphenidate 80mg/day and clonazepam 8mg/day**. For reasons previously stated in this report, this pattern of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient X.L-B.**

In this case, Dr. Weiss found it appropriate to prescribe this patient a combination of high-dose stimulant and high-dose benzodiazepine. On 10/06/2017, Dr. Weiss issued prescriptions for **Adderall 60mg/day and lorazepam 8mg/day**. In June 2017, Dr. Weiss writes what appears to be two prescriptions for **morphine sulfate ER 15mg tablets**. These two opioid prescriptions run concurrent with the prescriptions for lorazepam. Here, I will posit that there is no place for narcotic analgesia in an outpatient psychiatric practice, as this is well outside the scope of practice. By prescribing a high-dose benzodiazepine with the prescription opioid morphine (a DEA Schedule II controlled substance), Dr. Weiss put the patient at risk for significant CNS depression. There is a well-known *synergistic effect* when opioids and benzodiazepines are taken together, such that the CNS depression achieved in that manner is greater than what one would expect from the additive effects of each medication considered individually. This is the reason that the combination of benzodiazepines and prescription opioids are implicated in many overdose deaths. For the reasons outlined here and in previous cases in this section, this pattern of prescribing is, within a reasonable medical probability, outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient C.L.**

This case is another that suggests inappropriate prescribing by Dr. Weiss, based upon his use of very high dose stimulant and very high dose sedative in the same patient. Here, he prescribes patient C.L. a combination of **Adderall 120mg/day and Xanax 12mg/day**. As I have discussed at the outset of this report, both stimulant medications and benzodiazepines have toxicity syndromes which include grave medical outcomes, up to and including death. In the case of patient C.L., each of these medications are prescribed

in a very high range, where one would reasonably expect some toxic effects. I also discussed earlier in this report how a stimulant medication can generate anxiety symptoms, and how a sedative medication can cause cognitive impairment and memory disruption. In this case, one can reasonably predict that each medication can cause or exacerbate the very condition that the other medication is intended to treat (e.g., high-dose Adderall causing or worsening panic symptoms or high-dose Xanax interfering with attention). This manner of prescribing these medications runs contrary to sound clinic practice and, within a reasonable medical probability, falls outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Tr.Ma.

In this case, Dr. Weiss prescribes to a patient a combination of **modafinil 200mg/day, Xanax 8mg/day and Adderall 120mg/day.** I previously covered my concerns about the co-prescribing of modafinil, an amphetamine salt and a high-dose benzodiazepine in the discussion of patient J.H. It makes no clinical sense to prescribe modafinil for wakefulness in a patient who is prescribed Xanax 8mg/day; moreover, it makes no clinical sense to prescribe modafinil for wakefulness in a patient who is prescribed mixed amphetamine salts at 120mg/day. For the same reasons provided under the discussion of patient J.H., this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Th.Ma.

This is yet another case of Dr. Weiss prescribing his preferred stimulant, Adderall, in conjunction with his preferred sedative, Xanax. Here, he prescribes patient Th.Ma. a combination of **Adderall 90mg/day and Xanax 8mg/day**. This manner of prescribing a high-dose stimulant with a high-dose sedative, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient D.M.

This is another case demonstrating Dr. Weiss' preferred medication combination, Adderall and Xanax. Here he provides the patient with repeated prescriptions for **Adderall 80mg/day and Xanax 8mg/day**. This manner of prescribing a high-dose stimulant with a high-dose sedative, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patients A.M. and P.M

These two patients share the last name, and Dr. Weiss prescribed both of them the same regimen:  **Adderall 90mg/day and Xanax 8mg/day**. For the same reasons repeatedly cited in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient W.P.**

In this case, Dr. Weiss prescribes a patient a combination of **methylphenidate > 90mg/day and Xanax 8mg/day**. While the co-prescribing of high-dose stimulant and high-dose sedative appears fairly routine for Dr. Weiss, what is interesting here is that he chooses to issue the Ritalin prescription as **#290 methylphenidate 10mg tablets**, covering a 33-day supply of the medication. This results in the unnecessary dispensing of high-dosage units of methylphenidate; this in turn increases the impact of any drug diversion that may be occurring. When a reasonable psychiatrist decides to issue a methylphenidate prescription that involves a dose range of 40mg/day to 60mg/day, they generally write for the 20mg tablet size to limit the dosage units. Alternatively, a reasonable psychiatrist might consider an extended-release form of methylphenidate that offers even fewer dosage units at equivalent dosing. The manner in which these medications have been prescribed – the dosages of each medication, the combination of a high-dose stimulant and a high-dose sedative, and the dosage units written for –, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Th.Ri.**

This is yet another case in which Dr. Weiss demonstrates his tendency to write for a high-dose Schedule II stimulant, concurrently with a DEA Schedule IV sedative. This prescribing pattern for patient Th.Ri begins in July 2017, when Dr. Weiss writes for **Adderall 90mg/day and clonazepam 4mg/day**. What is most interesting about this case is Dr. Weiss' decision to write for a **diazepam suspension on both 9/15/2017 and 11/26/2017. On 9/15/2017, 700mL of a 5mg/5mL solution were dispensed; on 11/26/2017, 1200cc of a 5mg/5mL suspension were dispensed**. This is very concerning, as liquid suspensions of sedative medications come with a much higher risk of abuse and unintentional overdose. Sometimes, physicians will write for a liquid suspension form of a medication if required for tube feeds or if there is a swallowing dysfunction. In this case, there appeared to be no requirement for a liquid form of medication, when Dr. Weiss began prescribing the patient clonazepam and Adderall in July 2017. Here, a review of the patient chart will reveal if there was a valid medical reason to provide the patient with a clonazepam suspension. Consider that the 1200cc container(s) of diazepam suspension contained a total of 1,200mg of diazepam. Consider then that a contemporary shot glass with a 2 oz. capacity could hold almost 60mg of diazepam in this solution, within its walls. The risk of unintentional overdose should be apparent, and this is why a reasonable psychiatrist would not provide diazepam in a liquid suspension unless there was a good clinical reason for doing so. The prescription for the 1200cc dispensing of the diazepam 5mg/5mL solution corresponded to a 30 day supply of the medication, indicating that Dr. Weiss intended for the patient to use this medication at a rate of **40mg/day**. This pattern of prescribing high-dose stimulant medication with a sedative, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ch.Ri.**

This case again illustrates Dr. Weiss' common practice of prescribing high-dose stimulant and high-dose sedative concurrently. Here, he repeatedly writes the patient for **Adderall 120mg/day and Xanax 8mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Je.Ra.**

This is yet another case of Dr. Weiss co-prescribing a DEA Schedule II stimulant and a DEA Schedule IV sedative. Here, he writes for **Vyvanse 70mg/day and clonazepam 6mg/day**. An additional, strange feature of this case, is the manner in which Dr. Weiss, over the course of prescribing to the patient, appears to alternate haphazardly between Vyvanse and Adderall. Then, on some dates, such as 7/19/2017 and 3/01/2018, he writes for both **Adderall 60mg/day and Vyvanse 70mg/day on the same date**. This use of two high-dose stimulants concurrently is ill-advised, and the pattern of prescribing to patient Je.Ra, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient B.R.**

This case reveals Dr. Weiss' usual co-prescribing of **Adderall, at 90mg/day and Xanax, at ~4.5mg/day**, over a period of years. Other irregularities in this case include Dr. Weiss' repeated prescribing of **Midrin** (a DEA Schedule IV migraine abortive) and his repeated prescribing of the muscle relaxant **carisoprodol** (DEA Schedule IV). Psychiatrists do no typically prescribe muscle relaxants or Midrin for psychiatric conditions that fall under their scope of practice. Dr. Weiss also repeatedly prescribes Ambien to the patient, and, **on 7/09/2018, he prescribes to this female patient a combination of #463 Xanax 1mg tablets, #312 carisoprodol 350mg tablets, #90 zolpidem ER 12.5mg tablets, #14 zolpidem 10mg tablets and #27 Adderall 30mg tablets.** The Adderall issuance on this date corresponds to a 9-day supply of medication, indicating that Dr. Weiss intended for the patient to take **Adderall 90mg/day**. The Xanax issuance on 7/09/2018 corresponds to a 104-day supply of medication. Here, as in other cases, Dr. Weiss has provided, unnecessarily, high-dosage units of multiple controlled substance, operating in a way that a reasonable psychiatrist would decide against. To add to the concern in this case, after issuing an authorization for a 104-day supply of Xanax on 7/09/2018, Dr. Weiss then issues an authorization for an **additional, early fill of #135 alprazolam 1mg tablets on 7/21/2018**. On 7/10/2018, he provided an authorization for an **additional, early fill of #90 Adderall 30mg tablets**. This pattern is **highly suspicious for drug abuse and/or diversion**. For all of the reasons outlined in this discussion, Dr. Weiss' pattern of prescribing to patient B.R., within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient E.S.**

This is yet another case which demonstrates Dr. Weiss' pattern of prescribing high-dose stimulant and high-dose sedative concurrently. Here, he repeatedly prescribes patient E.S. a combination of **Adderall 120mg/day and Xanax 8mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Do.Su.**

This is yet another case in which Dr. Weiss found it appropriate to prescribe a patient high-dose stimulant concurrently with high-dose sedative. In this case, he provided patient Do.Su. with repeated prescriptions for **Adderall, allowing for doses as high as 120mg/day**, while also providing repeated prescriptions for **Xanax, up to 6mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patients WR.T.**

This is yet another case in which Dr. Weiss combines a high-dose stimulant with a sedative. Here, he repeatedly prescribes to patient WR.T. a combination of **Adderall 120mg/day and Xanax 6mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient J.T.**

This is yet another case in which Dr. Weiss combines a high-dose stimulant with a sedative. Here, he repeatedly prescribes to patient J.T. a combination of **Adderall 90mg/day and Xanax 6mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ty.Wa.**

This is yet another case demonstrating Dr. Weiss' widespread, concurrent prescribing of a high-dose stimulant and a high-dose sedative. Here, he repeatedly prescribes patient T.W. a combination of **Adderall 120mg/day** and **Xanax 8mg/day**, for a period greater than 3 ½ years. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient B.Wh.**

In the case of patient B.Wh., the typical **Adderall dose is 90mg/day**, in conjunction with **Xanax 8mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of

professional practice and is without a legitimate medical purpose.

**Patient B.Z.**

This is yet another case demonstrating Dr. Weiss' habitual prescribing of high-dose stimulant and high-dose sedative in combination. Here, he repeatedly prescribes patient B.Z. **Adderall 90mg/day** and **Xanax 8mg/day**. For the reasons addressed repeatedly in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

UNUSUAL PRESCRIBING PATTERN #3:  High-dose Stimulants and Stimulants in Combination

Dr. Weiss routinely prescribed to patients high doses of stimulant medications, including doses that one would reasonably expect to cause the patient stimulant toxicity. While Dr. Weiss prescribed a range of stimulant medications to patients – including methamphetamine –, he demonstrated a clear preference for immediate-release Adderall, also known as mixed amphetamine salt.

Dr. Weiss routinely prescribed stimulant medications at the upper end of their usual dosing range or well beyond the upper end of their usual dosing range. Concerning immediate-release Adderall, CMS has published, ***"Only in rare cases will it be necessary to exceed a total of 40mg per day."*** Likewise, Micromedex informs us that doses of immediate-release Adderall greater than 40mg/day are rarely needed. Concerning Adderall XR, the usual adult dosage is 20mg/day; Dr. Stahl advises a maximum of 30mg/day.  The PDR publishes that the average effective dose range of methylphenidate in adults is 20 to 30mg per day; the maximum dose of methylphenidate, per FDA labeling, is 60mg/day. Concerning methylphenidate ER, the FDA labelling specifies that the maximum dosage of methylphenidate ER should not exceed 72mg/day in adults and adolescents. Concerning Vyvanse, CMS recommends a maximum dose of 70mg/day, and this is the maximum specified in the FDA labelling.

To summarize this information, I will summarize usual prescribing by repeating information that I provided at the beginning of this report. It should be a rare event to see Adderall IR prescribed at greater than 40mg/day; Adderall XR at greater than 30mg/day and methylphenidate IR at greater than 40mg/day. Infrequent excursions outside of these ranges may be seen; however, these excursions should not be a pattern of practice. Moreover, it should be a cause for concern, any time that methylphenidate ER is prescribed at doses greater than 72mg/day or Vyvanse is prescribed at greater than 70mg/day. Dr. Weiss sometimes achieved an overall high stimulant dose – and increased the risk of stimulant toxicity – in certain patients by combining stimulant medications in an unusual and reckless way.

**Patient Co.Be.**

This case demonstrates Dr. Weiss' tendency to prescribe unusually high doses of stimulant medication. Here, he prescribes a patient **Vyvanse 80mg po daily**. This is clearly in excess of the maximum recommended dosages according to Micromedex and the PDR. **FDA labelling also identifies a maximum Vyvanse dose of 70mg/day for the ADHD indication**. At a point later in treatment, Dr. Weiss prescribes to Patient Co.Be. Adderall 60mg/day. This manner of prescribing unusually high doses of a stimulant medication, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Kr.Bi.**

This case is another example of Dr. Weiss prescribing an unusually high dose of a stimulant medication. In this case, he authorizes repeated refills for **Adderall XR 50mg po daily**. This dosage far exceeds the usual dosage of Adderall XR 20mg/day in adults. This manner of prescribing unusually high doses of a stimulant medication, within a reasonable medical probability, is outside if the usual course of professional practice and is without a legitimate medical purpose.

**Patient J.C.**

This case demonstrated Dr. Weiss' achievement of high levels of stimulant exposure by combining stimulant medications. In this case, he provides recurrent prescriptions of **Adderall 60mg/day in conjunction with Adderall XR 20mg/day**. This manner of prescribing to achieve a high level of exposure to mixed amphetamine salts, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient M.C.**

This is another case of Dr. Weiss prescribing an unusually high dose of a stimulant medication to a patient. Here, he repeatedly prescribes **Vyvanse 120mg/day** to a patient. Recall that the maximum dose of Vyvanse established by the FDA labelling is 70mg/day. This manner of prescribing unusually high doses of a stimulant medication, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ch.Co.**

This is another case in which Dr. Weiss appears to **authorize 90-day supplies of Adderall and Adderall XR**. This allows the patient to obtain **180 dosage units of Adderall and Adderall XR on multiple occasions**. As an example of this, Dr. Weiss prescribed to the patient #180 Adderall XR 30mg capsules to the patient on 8/09/2015, and these were filled on 8/14/2015. It appears that Dr. Weiss entered **an additional, early authorization** for #60 Adderall XR 30mg capsules the next day, on 8/10/2015, and these were filled on 8/18/2015. Counting the two prescriptions, Dr. Weiss authorized a total of **240 dosage units of Adderall XR** to the patient, between 8/09/2015 and 8/10/2015. As

mentioned in the discussion of other cases within this report, this authorization of high dosage units is unnecessary, reckless and facilitates diversion, wherever that may be taking place. The authorization of #180 Adderall XR 30mg capsules on 8/09/2015 corresponded to a 90-day supply of the medication, meaning that Dr. Weiss intended for the patient to take a minimum of **Adderall XR 60mg/day**. This is **three times the established usual dosage of Adderall XR**. It also appears that the patient may have picked up an **early refill of Adderall XR** on 6/09/2016. This manner of prescribing – to include the dosage of stimulant medications achieved and the release of high dosage units of stimulant medications –, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Am.Cr.

This is a case in which Dr. Weiss repeatedly prescribed to this patient #120 Adderall 30mg tablets, corresponding to an intended dosage of **Adderall 120mg/day**. This manner of prescribing unusually high doses of a stimulant medication, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Ch.Cu.

This is a case in which Dr. Weiss repeatedly prescribed to this patient #120 Adderall 30mg tablets, corresponding to an intended dosage of **Adderall 120mg/day.** This manner of prescribing unusually high doses of a stimulant medication, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Au.Da.

In the case of patient Au.Da., Dr. Weiss again demonstrates his willingness to prescribe unusually high doses of DEA Schedule II stimulant medications. He initially prescribes patient Au.Da. immediate-release **Adderall 90mg/day**. Later in treatment, he prescribes him **methylphenidate ER 108mg/day**. This dose of methylphenidate ER exceeds the maximum of 72mg/day specified by the FDA labeling. This manner of prescribing unusually high doses of stimulant medications, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Ra.Da.

Dr. Weiss prescribes multi-month supplies of immediate-release methylphenidate to this patient, resulting in the dispensing of high dosage units. On 7/24/2015, Dr. Weiss writes for **#180 methylphenidate 20mg tablets**, corresponding to a 90-day supply of medication. On 9/30/2015, he writes for **#360 methylphenidate 20mg tablets**, corresponding to a 180-day supply of medication. This manner of prescribing multi-month supplies of a DEA Schedule II medication is reckless and unnecessary, and it cannot be argued from the standpoint of cost or insurance company pressure to write a single prescription for a greater-than-30-day supply of a DEA Schedule II stimulant

medication. Here I will assert that a reasonable physician would have seen the hazard (i.e., the community risk from potential distribution) in issuing a 90-day or 180-day supply of methylphenidate and would have instead issued single prescriptions allowing for individual 30-day fills of the medication. The issuance of a 180-day supply of methylphenidate **appears to be a violation of Title 21 Code of Federal Regulations, Part 1306**, as covered in the discussion for patient P.C.

### Patient K.E.

This is another case in which Dr. Weiss achieves high levels of mixed amphetamine salt dosing, by using both immediate-release and extended-release forms of Adderall. Here, he simultaneously prescribes patient K.E. **Adderall XR 60mg/day** and **Adderall 60mg/day**. For reasons cited earlier in this section, this manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient B.F.

In this case, Dr. Weiss concurrently prescribes to a patient **Adderall 60mg/day and Vyvanse 70mg/day**. Combining two different stimulants, each at the upper end of their dosing ranges, is an unusual practice. This particular combination offers no unique clinical benefit and places the patient and undue risk of stimulant toxicity. This manner of prescribing, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient A.G.

Dr. Weiss regularly prescribed to patient A.G. **Adderall XR 90mg/day**. This is far in excess of the usual dosage of Adderall XR, at 20mg/day. It also exceeds the maximum dose of 30mg/day recommended by Dr. Stahl, and it exceeds any dosage given to patients during the clinical trials which led to the FDA approval of Adderall XR for the treatment of ADHD. This is covered in the FDA data sheet for Adderall XR:

> *A double-blind, randomized, placebo-controlled, parallel-group study was conducted in adults (N=255) who met DSM-IV-TR criteria for ADHD. Patients were randomized to fixed dose treatment groups receiving final doses of 20, 40, or 60 mg of ADDERALL XR® or placebo once daily in the morning for four weeks. Significant improvements, measured with the Attention Deficit Hyperactivity Disorder-Rating Scale (ADHD-RS), an 18- item scale that measures the core symptoms of ADHD symptoms, were observed at endpoint for all ADDERALL XR® doses compared to patients who received placebo for all four weeks. There was not adequate evidence that doses greater than 20 mg/day conferred additional benefit.*

This serves as a reminder that **the highest titration of Adderall XR used in the clinical trial was 60mg/day**, and there was **no evidence that using doses greater than**

**20mg/day provided additional benefit** to patients.  This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient Je.Lo.

This case is not unusual for Dr. Weiss, in that it demonstrates his preference for prescribing high dose stimulants, particularly Adderall. Here, he prescribes the patient **Adderall in doses up to 120mg/day**. What is also interesting about this case is that there appear to be **early refills of Adderall on 10/31/2017 and on 7/23/2018**. This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient L.L.**

In this case, Dr. Weiss prescribes **two high-dose stimulant medications** to a patient, concurrently.  These recurring prescriptions included **Adderall 60mg/day and Adderall XR 40mg/day**. This pattern of prescribing high total doses of mixed amphetamine salts, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Am.Ma.**

This is another case which demonstrates Dr. Weiss' preference for prescribing high-dose stimulants, in conjunction with a sedative. Here, he writes recurring prescriptions for **methylphenidate 80mg/day and Xanax**. The reader will recall that the average effective dose range of methylphenidate for adults with ADHD is 20 to 30mg per day; the maximum dosage per FDA labelling is 60mg/day. This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient K.M.

This case serves as a reminder that Dr. Weiss frequently prescribes stimulant medications at excessive dosing. Here, he provides repeated prescriptions for **Vyvanse 100mg/day**. Recall that the FDA labelling for Vyvanse specifies a maximum dose of 70mg/day. This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient S.N.**

Dr. Weiss repeatedly prescribed patient S.N. **methylphenidate 80mg/day**, sometimes in conjunction with Ambien 10mg/day. This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Da.Sp.**

Dexedrine is a DEA schedule II stimulant. In this case, Dr. Weiss prescribes a patient a combination of **Dexedrine 30mg/day and Dexedrine ER 20mg/day**. Here he also writes, unnecessarily, for high dosage units of each of these medications. On 6/19/2015, he writes for **#540 Dexedrine 5mg tablets**, corresponding to a 90-day supply of this medication. On several occasions, he writes for #180 Dexedrine ER 10mg capsules, corresponding to a 90-day supply of the medication. No reasonable psychiatrist would issue a prescription for these high dosage units of the DEA Schedule II stimulants, as they would recognize the risk of drug abuse and/or diversion in so doing. The FDA-approved uses of Dexedrine include the treatment of narcolepsy and the treatment of ADHD in patients age 6 to 16 years. The FDA label provides that, when treating ADHD in pediatric patients age 6 and older, only in rare cases will it be necessary to exceed 40mg/day. This manner of prescribing high-dose Dexedrine and high-dosage units of Dexedrine, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Ry.Ro.**

This is another case demonstrating Dr. Weiss' tendency to combine stimulant medications, while achieving high cumulative stimulant dosing. Here, he repeatedly writes patient Ry.Ro. for **Adderall 60mg/day, concurrent with Adderall XR 40mg/day**. This provided the patient with a **cumulative mixed amphetamine salt dosage of 100mg/day**. This pattern of prescribing unreasonably high doses of stimulant mediations, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient J.S.**

This is yet another case of Dr. Weiss achieving an excessive, cumulative stimulant dose by combining stimulants. In this case, he repeatedly prescribes to patient J.S. a combination of **Vyvanse 70mg/day and Adderall 90mg/day**. This pattern of prescribing combined, high doses of stimulant mediations, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient F.S.**

This is yet another case of Dr. Weiss achieving an excessive, cumulative stimulant dose by combining stimulants. In this case, he repeatedly prescribes to patient F.S. a combination of **Adderall XR 90mg/day and Vyvanse 70mg/day.** This pattern of prescribing combined, high doses of stimulant mediations, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Tr.Ye.**

The PDMP opens for patient Tr.Ye. with Dr. Weiss prescribing to him a combination of **methylphenidate 80mg/day** and **Xanax 3mg/day**.  Approximately one month after the initial entries for methylphenidate and Xanax, Dr. Weiss adds the hypnotic **zolpidem**. Here, one should rightly wonder if Dr. Weiss considered that his use of high-dose methylphenidate was contributing to – or causing – the patient's problems with anxiety or insomnia. This pattern of prescribing unreasonably high doses of stimulant mediation, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

UNUSUAL PRESCRIBING PATTERN #4:  High-dose Sedatives and Sedatives in Combination

In a manner similar to his stimulant prescribing, Dr. Weiss demonstrated a preference for use of high-dose sedative/anxiolytic medications. In some cases, this was achieved with a single sedative medication; in a number of cases, it was achieved with stacking of sedative medications. In each of these ways, Dr. Weiss put patients at risk of significant sedative toxicity and cumulative CNS depression.  In an earlier section of this report, I mentioned that sedative medications are not the first-line or second-line treatment for most anxiety disorders. I also provided a number of reasons that Xanax was a particularly problematic sedative/anxiolytic medication and that for that reason, many psychiatrists minimize its use in their practice. In the same section, I also revealed that, for the general "anxiety" indication, the label for Xanax specifies a maximum daily dose of 4mg/day in adults. I also referenced the APA Practice Guideline for panic disorder which provided the usual therapeutic dose for several benzodiazepines. This guideline provided a usual therapeutic dose of 2-4mg/day, when Xanax is selected as a sedative/anxiolytic treatment. The same guideline made clear that SSRI's, SNRI's and TCA's are all preferable to benzodiazepines used as monotherapy.

**Patient S.A.**
Dr. Weiss prescribed patient S.A. alprazolam at high doses, most often **Xanax 8mg per day**, for an extended period of time, from 3/11/2015 to 8/15/2018. This chronic prescribing of high doses of alprazolam certainly increases the misuse liability. On 5/11/2015, the patient filled #120 alprazolam 2mg tablets, corresponding to a 30-day supply of medication. The very next day, on 5/12/2015, she filled #30 diazepam 5mg tablets. Considering that the patient was already on a high dose of Xanax, this addition of a second benzodiazepine is worrisome, from the standpoint of **cumulative CNS depression**. The PDMP is provider-specific, so it does not reveal if patient S.A. was also receiving controlled substance medications from other providers during the same time interval. This pattern of prescribing multiple sedatives, including high-dose Xanax, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

48

**Patient T.B.**

This is a patient to whom Dr. Weiss prescribed chronic, high-dose Xanax. The prescription issuances on this PDMP cover the period 11/13/2014 to 7/19/2018. This included multiple issuances of prescriptions for **#150 Xanax 2mg tablets**, allowing for **Xanax 10mg/day**. This long-term use of high-dose Xanax, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient J.C-L.**

Dr. Weiss prescribed a very high dose of Xanax to this patient. On 3/21/2015, Dr. Weiss issued a prescription for #180 Xanax 2mg, corresponding to a 30-day supply of medication. This would allow for **Xanax 12mg/daily**. This is a very high dose range of Xanax; it is difficult to justify medically and places the patient at high risk of sedative toxicity. Dr. Weiss also provided this patient with other authorizations, allowing for Xanax 10mg/day and Xanax 6mg/day. This pattern of high-dose sedative prescribing, within a reasonable medical probability, is outside the usual course of professional practice and without a legitimate medical purpose.

**Patient N.D.**

This case is another egregious example of Dr. Weiss' willingness to prescribe multiple, concurrent, high-dose GABA agonists to a patient. Dr. Weiss prescribed these agents to patient N.D. over a period of years, with the actual data likely limited by the time restrictions on the PDMP. He began prescribing a combination of Xanax 4mg/day, clonazepam 1.5mg/day and zolpidem 10mg/day to this female patient, in March 2015. Here I will again reference the FDA advisory regarding the prescribing of Ambien to female patients. By 4/19/2016, Dr. Weiss has escalated this unusual concoction of high-dose sedatives to a combination of **Valium 60mg/day, lorazepam 6mg/day, alprazolam 3.5mg/day and Ambien 10mg po qhs**. This combination of sedative and hypnotic medications is reckless and puts the patient at considerable risk of CNS depression, respiratory suppression and death. Based upon this combination of sedating medications and dosages achieved, I can comfortably state that no medical condition warrants this particular regimen. This pattern of combined sedative and hypnotic prescribing, within a reasonable medical probability, is outside the usual course of professional practice and without a legitimate medical purpose.

**Patient St.Le.**

In this case, Dr. Weiss again demonstrates his willingness to prescribe multiple sedatives simultaneously, and at high doses. On 9/11/2017, Dr. Weiss prescribed patient St.Le. a combination of **Xanax 8mg/day and flurazepam 30mg/day**. At other times, Dr. Weiss prescribed patient St.Le. **Valium 60mg/day**. A very ill-advised practice seen here is Dr. Weiss's writing of high-dosage units to cover longer periods of time. At times, he writes for **#360 diazepam 10mg tablets** and for **#360 alprazolam 2mg tablets**. Here I will observe that diazepam and alprazolam are among the most frequently requested

benzodiazepine medications by those seeking sedatives for non-medical use; each of these drugs carries a definite street value. If these drugs were being diverted, then these high dosage units amplify the societal impact of that activity. A reasonable psychiatrist would have not prescribed these medications at these doses and in these combinations; a reasonable psychiatrist would not have authorized high dosage units of these medications. This pattern of combined sedative prescribing and issuance of high dosage units of sedative medications, within a reasonable medical probability, is outside the usual course of professional practice and without a legitimate medical purpose.

### Patient Sh.Li.

In this case, Dr. Weiss re-demonstrates his willingness to prescribe high-dose stimulant, high-dose benzodiazepine and a hypnotic in combination. Here, he prescribes a female patient a combination of **Adderall 60mg/day, zolpidem ER 12.5mg/day and Valium 40mg/day**. In 2013, the FDA released an updated safety advisory for Ambien and Ambien CR:

> *The recommended initial dose of certain immediate-release zolpidem products (Ambien and Edluar) is 5 mg for women and either 5 mg or 10 mg for men. The recommended initial dose of zolpidem extended-release (Ambien CR) is 6.25 mg for women and either 6.25 or 12.5 mg for men. If the lower doses (5 mg for immediate-release, 6.25 mg for extended-release) are not effective, the dose can be increased to 10 mg for immediate-release products and 12.5 mg for zolpidem extended-release. However, use of the higher dose can increase the risk of next-day impairment of driving and other activities that require full alertness.*

By prescribing high-dose diazepam in conjunction with zolpidem, Dr. Weiss has undermined the very point of that advisory and placed the patient at risk of excessive CNS depression. This pattern of combining hypnotic and sedative medications – also in conjunction with a high-dose stimulant medication – is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose.

### Patient S.M.

This is another alarming case of Dr. Weiss' willingness to write for multiple sedatives concurrently. Here, he writes a female patient a combination of **Xanax 4mg/day, Ambien 10mg/day and clonazepam 8mg/day**. This combination of two benzodiazepines and one hypnotic medication place the patient at considerable risk of sedative toxicity, the symptoms of which are described at the beginning of this report. This pattern of prescribing multiple sedative and hypnotic medications, within a reasonable medical probability, is outside of the usual course of professional practice and without a legitimate medical purpose.

50

**Patient H.M.**
This is another case, demonstrating Dr. Weiss' common practice of prescribing a DEA Schedule II stimulant in conjunction with one or more DEA Schedule IV sedatives. Here, he prescribes a patient the combination of **Adderall 40mg/day, clonazepam 8mg/day and Xanax 4mg/day**. This pattern of prescribing multiple sedative mediations – and in conjunction with a stimulant medication – is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient Mi.Po.**
This is yet another case of Dr. Weiss prescribing an unusual combination of a stimulant medication and multiple sedative and/or hypnotic medications, concurrently. As an example of this, Dr. Weiss issues prescriptions on 3/03/3015 for **Adderall 40mg/day, Valium 15mg/day, zaleplon 10mg/day, Ambien 10mg/day.** The prescribing of these medications in combination appears to fall outside of the usual course of professional practice. The co-prescribing of Valium, zaleplon (a DEA Schedule IV hypnotic) and Ambien is ill-advised and places the patient at unreasonable risk of sedative toxicity. One may also rightly question if the inclusion of the stimulant in the regimen is causing or contributing to insomnia or to anxiety. At other times, Dr. Weiss writes the patient for a combination of Lunesta, Valium, and zaleplon. By 6/22/2016, Dr. Weiss has advanced this strange regimen to **Ambien 10mg/day, Valium 20mg/day, zaleplon 10mg/day and Adderall 60mg/day**. This pattern of prescribing multiple sedatives and hypnotics to a patient – and in conjunction with a high-dose stimulant medication – is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient Co.Ro.**
In this case, Dr. Weiss wrote this patient a high-dose of Xanax repeatedly, on a long-term basis. The prescribed **Xanax dose was often 10mg/day**. There are **suggestions of early refills of Xanax at multiple points**, including on 5/29/2017, 6/20/2017, 9/08/2017, 10/25/2017, 11/06/2017, 11/22/2017 and 8/09/2019. This pattern of prescribing high-dose, long term sedatives – and providing early refills of sedatives – is, within a reasonable medical probability, outside of the usual course of professional practice and without a legitimate medical purpose.

**Patient Jo.Sc.**
In this case, Dr. Weiss prescribes two benzodiazepines, alprazolam and temazepam, to patient Jo.Sc. repeatedly. The prescribed **Xanax dose was generally 10mg/day**, and the prescribed **temazepam dose was generally 30mg/day**.  In this case, there appear to be multiple instances of **early refills of Xanax**, on fill dates 6/16/2015, 6/29/2015, 12/23/2015, and 10/20/2017. On 10/2/2016, Dr. Weiss wrote for **hydrocodone/APAP** for this patient. As I have indicated earlier in this report, writing for narcotic analgesia is outside of the scope of practice for an outpatient Psychiatry clinic. This is particularly

concerning in this case, as Dr. Weiss was, at the same time that he issued the hydrocodone prescription, writing the patient for two benzodiazepine medications, including high-dose Xanax.  There is a well-known *synergistic effect* when opioids and benzodiazepines are taken together, such that the CNS depression achieved in that manner is greater than what one would expect from the additive effects of each medication considered individually. This is the reason that the combination of benzodiazepines and prescription opioids are implicated in many overdose deaths. In this case, Dr. Weiss has willingly prescribed a narcotic analgesic to the same patient that he was already prescribing a combination of benzodiazepine medications. This pattern of prescribing multiple sedatives to a patient – and in conjunction with an opioid – places the patient at high risk of sedative toxicity; within a reasonable medical probability, it is outside of the usual course of professional practice and without a legitimate medical purpose.

### Patient Da.So.

This case is also concerning because of Dr. Weiss' issuances of multiple prescriptions for high dosage units of Xanax. In this case, he issues multiple prescriptions for **#450 Xanax 2mg tablets**. In some cases, these prescriptions for #450 Xanax 2mg tablets correspond to a 56-day supply (as on 10/10/2016); in other cases, they correspond to a 90-day supply. **At the uppermost limit of this prescribing, that corresponds to 16mg of Xanax daily; at the lower limit, it corresponds to 10mg of Xanax daily**. These are exceedingly high dose ranges and they are ranges which put the patient at risk for benzodiazepine toxicity. No reasonable psychiatrist would prescribe Xanax at these doses and no reasonable psychiatrist would issue a prescription for #450 dosage units of Xanax. I believe that it is reasonable to suspect substance abuse and/or diversion in this case.  Dr. Weiss' prescribing of Xanax in this manner, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

### Patient S.VD.

This case is very concerning in that Dr. Weiss prescribes to a female patient a combination of a high-dose benzodiazepine, in combination with a high-dose hypnotic. Dr. Weiss repeatedly writes for this patient **Ativan 8mg/day, in addition to Lunesta 9mg/day**. This combination of medications at these doses placed the patient at significant risk of cumulative CNS depression and sedative toxicity. The FDA label for Lunesta specifies the recommending starting dose of the medication as 1mg nightly; it specifies the maximum dose of Lunesta as 3mg nightly. Dr. Weiss has plainly exceeded that and compounded the patient's risk by co-prescribing Lunesta with high-dose Ativan. This manner of prescribing high-dose lorazepam concurrently with an excessive dose of Lunesta, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

**Patient Be.Wa.**

This is yet another case in which Dr. Weiss provides a female patient with multiple sedative and/or hypnotic drugs in combination. Here, he provides the patient with simultaneous prescriptions for **Xanax 3mg/day, zaleplon 10mg/day and Ambien 10mg/day**. In other sections of this report, I have discussed not only the hazards in stacking sedative and hypnotic drugs this way, but also the FDA advisory on Ambien. This manner of prescribing multiple sedative and hypnotics in combination, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

MISCELLANEOUS PRESCRIBING CONCERNS

The following patient entries on the provider PDMP generated concern for appropriateness of prescribing, based upon the particular medications used, the particular combination of medications prescribed and/or the dosages of medications achieved. An opinion about whether these prescribing instances were within the usual course of professional practice or with a legitimate medical purpose may be arrived at by a review of the individual patient charts.

**Patient M.L.**

This is another case in which Dr. Weiss found it appropriate to prescribe a patient a high-dose stimulant and a high-dose sedative, concurrently. He provided recurrent prescriptions for **#120 Adderall 10mg tablets**, either with a prescription for **clonazepam 8mg/day** or for **alprazolam 8mg/day**. Here, Dr. Weiss elects to prescribe a smaller tablet size of Adderall, with high monthly dosage units.

**Patient D.A.**

On 9/16/2016, patient D.A. filled #90 Adderall 20mg tablets on Dr. Weiss' authorization, corresponding to a 30-day supply of medication. This places the patient dose of immediate-release Adderall at 60mg per day, clearly in excess of the 40mg per day that are not usually required, according to multiple sources (Micromedex, CMS, PDR and Dr. Stahl).

**Patient Ja.Aj.**

In this case, Dr. Weiss authorized multiple fills of #60 Adderall 30mg tablets for the patient, each corresponding to a 30-day supply. This places the patient dose of immediate-release Adderall at 60mg per day, clearly in excess of the 40mg per day that are not usually required, according to multiple sources (Micromedex, CMS, PDR and Dr. Stahl).

**Patient W.A. and Patient J.A.**

These two patient cases also illustrate Dr. Weiss' tendency to prescribe Adderall and a benzodiazepine in combination, as well as his tendency to prescribe high-dose Adderall. Each of these patients was prescribed Adderall at 60mg po daily.

**Patient R.A.**

This case illustrates Dr. Weiss' willingness to prescribe high-dose benzodiazepines, involving high dosage units, over a long period of time. At one point, Dr. Weiss prescribed patient R.A. **#120 lorazepam 2mg tablets**, corresponding to dosing at 8mg per day. He prescribed lorazepam to patient R.A., from 8/15/2014 to 5/27/2018, according to this PDMP report. These high dosage units only facilitate and compound drug diversion, wherever that might be occurring.

**Patient K.B.**

In the case of patient K.B., Dr. Weiss prescribed the patient the analgesic **tramadol**, in addition to **clonazepam**. In my opinion, prescribing tramadol or narcotic analgesia falls outside of the scope of practice for a Psychiatry clinic.

**Patient C.B.**

In the case of patient C.B. Dr. Weiss prescribes recurrent prescriptions for #90 alprazolam 2mg tablets, corresponding to **Xanax 6mg po daily**. He also prescribes to her the muscle relaxant **carisoprodol** at intervals, between 3/25/2017 and 8/25/2018. Prescribing muscle relaxants is not a common practice in outpatient Psychiatry; in this case, a reasonable provider would likely not have prescribed carisoprodol in addition to Xanax 6mg po daily, based upon a concern for cumulative sedation.

**Patient T.B-O.**

This case illustrates another trend of Dr. Weiss:  the co-prescribing of a hypnotic medication and a benzodiazepine. In this case, Dr. Weiss prescribed a female patient Ambien 10mg po nightly, in addition to clonazepam 1mg po tid. In 2013, the FDA released an updated safety advisory for Ambien and Ambien CR:

> *The recommended initial dose of certain immediate-release zolpidem products (Ambien and Edluar) is 5 mg for women and either 5 mg or 10 mg for men. The recommended initial dose of zolpidem extended-release (Ambien CR) is 6.25 mg for women and either 6.25 or 12.5 mg for men. If the lower doses (5 mg for immediate-release, 6.25 mg for extended-release) are not effective, the dose can be increased to 10 mg for immediate-release products and 12.5 mg for zolpidem extended-release. However, use of the higher dose can increase the risk of next-day impairment of driving and other activities that require full alertness.*

The initial prescription entry for this patient on Dr. Weiss' provider PDMP is for Ambien 10mg nightly. Without reviewing the chart, it is impossible to determine whether the patient was previously taking Ambien 5mg nightly from another provider. In any case, it is ill-advised to have a patient taking clonazepam 1mg po three times daily, in conjunction with Ambien. Clonazepam is a sedating benzodiazepine that has a long half-life.

**Patient R.B.**
This is another case which demonstrates Dr. Weiss' tendency to prescribe a benzodiazepine medication and Adderall (in doses up to 60mg daily), and on a chronic basis.

**Patient W.B.**
This is another case which demonstrates Dr. Weiss' tendency to prescribe a Xanax and Adderall on a chronic basis.

**Patient Ja.Be.**
This is another case where Dr. Weiss prescribes a patient high-dose Xanax (8mg/day), in addition to Adderall.

**Patient Je.Be.**
This case is unusual, in that it involves the off-label prescription of **ketamine powder** to a patient. Each of two ketamine powder prescriptions was issued to this patient in January 2018. The use of ketamine in Psychiatry has been very controversial. While there are a small number of providers – often non-Psychiatrists – who have provided IV infusions of ketamine to patients for mood disturbances, the FDA has not approved a non-anesthetic use of IV ketamine. Most providers would agree that use of IV ketamine is in fact controversial, and that any administration of IV ketamine must involve careful, in-office monitoring of the patient, to include pulse oximetry and vital sign monitoring. In March 2019, the FDA approved use of intranasal Spravato (esketamine), for treatment-resistant depression; however, even the use of Spravato requires in-office monitoring. It would be interesting to know Dr. Weiss' intended indication for the ketamine powder, which again, is not FDA-approved for treating any psychiatric condition. If Dr. Weiss intended it to be used for treatment-resistant depression, then it is a curious matter that he would later prescribe the CNS depressant clonazepam to the same patient.

**Patient Ch.Bl.**
In this case, Dr. Weiss has prescribed a combination of the stimulant Vyvanse at 70mg/day and the benzodiazepine clonazepam at 4mg/day to a patient for greater than a 2-year period, from 1/28/2015 to 2/08/2017.

**Patients Co.Bl. and Ja.Bl. and L-G.Bl.**
These are three patients with the same last name, to whom Dr. Weiss prescribed **Adderall 60mg/day**.

**Patient Ma.Br.**
This is a case of a female patient to whom Dr. Weiss prescribed a combination of Adderall XR 40mg/day, Xanax and flurazepam.

**Patient Ra.Br.**

This case again demonstrates Dr. Weiss' tendency to prescribe high dose Adderall. In this case, he repeatedly authorizes immediate-release Adderall at 60mg/day.

**Patient Ro.Br.**

In this case, Dr. Weiss again prescribes to the patient a combination of a benzodiazepine (Valium) and a hypnotic (Lunesta).

**Patient S.C.**

Dr. Weiss prescribed to this patient the strange but recurring combination of Adderall, Adderall XR and Xanax.

**Patients M.D. and T.D.**

In each of these patient cases, Dr. Weiss prescribed immediate-release Adderall at 60mg/day. He simultaneously prescribed to patient T.D. diazepam 20mg/day.

**Patient S.J.**

In this case, Dr. Weiss prescribed high-dose alprazolam (typically 6mg/day) in conjunction with zolpidem 10mg nightly, on a long-term basis to a patient. In this series, I have previously discussed the hazards of prescribing multiple GABA agonists concurrently; I have also discussed the FDA advisory concerning the prescribing of zolpidem to female patients.

**Patient B.L.**

This case is another reminder that, when Dr. Weiss prescribes a stimulant other than Adderall, he also prefers a high dose of medication. Here, he prescribes patient B.L. a combination of **methylphenidate 60mg/day and Xanax 6mg/day**.

**Patient C.M.**

This is another case demonstrating Dr. Weiss' preferred medication combination, Adderall and Xanax. Here he provides the patient with repeated prescriptions for **Adderall ER 60mg/day and Xanax 4mg/day**. On two occasions, 1/19/2015 and 3/19/2015, Dr. Weiss issues single prescriptions for **#180 Adderall ER 20mg tablets**, to cover a 60-day supply. As indicated in an earlier section of this report, a reasonable psychiatrist would avoid the unnecessary writing of high-dosage units of a DEA Schedule II stimulant, to limit the opportunities for drug abuse and drug diversion.

**Patient P.S.**

In this case, Dr. Weiss repeatedly and unnecessarily writes for high dosage units of clonazepam. In some cases, he writes for **#300 clonazepam 0.5mg tablets** to cover a 75-day supply; in other cases, he writes for **#270 clonazepam 0.5mg tablets** to cover a 90-day supply. I previously covered some aspects of the pharmacology of clonazepam and that availability of larger clonazepam tablet sizes in my discussion of patient D.A. These

factors mean that dispensing a high number of low-dose clonazepam tablets accomplishes nothing more than increasing the risk and impact of diversion.

**Patient C.W.**

This case is interesting in that the PDMP reveals that prescription issuances for high-dose sedative medications were entered on a single date. Without reviewing the corresponding medical chart, it's impossible to tell if these prescription issuances were related to a single office visit. Here, Dr. Weiss authorizes #120 Xanax 2mg tablets and #3 clonazepam 2mg tablets (corresponding to one day of medication) on 2/24/2017. This may be an artifact of the date limits for this particular PDMP report, or it could represent the absence of any reasonable sedative titration.

**Patient K.W.**

This is a case of a patient (assumed to be female by name) to whom Dr. Weiss prescribed a combination of Adderall XR 60mg/day, zolpidem 10mg po qhs and Xanax 4mg/day. The date limits of the current PDMP are unknown. If the PDMP reflects the entirety of Dr. Weiss' prescribing to patient K.W., then it would appear that he started her on a sedative combination of Xanax 4mg/day and zolpidem 10mg po qhs, showing complete disregard for the FDA advisory on zolpidem and for the risk of cumulative CNS depression. In any case, Dr. Weiss demonstrates his willingness to prescribe sedatives and hypnotics together, and in conjunction with high-dose stimulant medication.

**Patient H.Z.**

In addition to prescribing patient H.Z. clonazepam, lorazepam, diazepam and temazepam at different points in time, Dr. Weiss also prescribes **tramadol** on 3/31/2017. This again illustrates Dr. Weiss' decision to prescribe pain medications that wouldn't ordinarily fall under the scope of outpatient psychiatric practice.

<u>THE OHIO PATIENT</u>

I was also provided the PDMP for a single patient in Ohio, a patient G.K. The fill date range on this report is from 7/07/2014 to 8/22/2018. The report opens with fills of **#150 alprazolam 2mg tablets**, per Dr. Weiss, on 7/07/2014. This fill of alprazolam corresponds to a 30-day supply of the medication; this reveals that the prescription allowed for **Xanax 10mg/day**. There appears to be a pause in Dr. Weiss' prescribing following this, until May of 2017; however, during that interval, patient G.K. received Xanax prescriptions and Adderall prescriptions from other providers. He also received a prescription of **Suboxone** from a Dr. Radha Baishnab on 8/13/2014, suggesting that patient G.K. was being treated for opioid dependence. In April 2017, patient G.K. also received prescriptions of Suboxone from a Dr. Mohan Kareti.  In May 2017, Dr. Weiss prescribed to patient G.K. a combination of **Xanax 10mg/day** and **Adderall 90mg/day**. From May 2017 8/22/2018, Dr. Weiss provided to patient G.K. regular, **recurring prescriptions of both Xanax and Adderall** at these dosages. Patient G.K. also

continued to receive **recurring prescriptions of buprenorphine/naloxone** from various providers.

This particular case is critical to the current review because, for all of the other patients considered in this report, their substance abuse histories and individual PDMP's are not provided. Without looking at the individual patient charts, it is not possible to tell if Dr. Weiss used or responded to concerning PDMP data or if he solicited or properly responded to known addiction. Buprenorphine and all buprenorphine-containing products are DEA Schedule III controlled substances. The combination of buprenorphine/naloxone is commonly used an opioid replacement strategy in the treatment of opioid addiction. The same hazard of synergistic CNS depression described earlier in this report during the discussion of opioid and sedative combinations also applies to the combination of buprenorphine and sedatives. The fact that Dr. Weiss prescribed high-dose Xanax to an individual receiving buprenorphine placed that individual at an unreasonable risk of CNS depression. It may be possible that Dr. Weiss did not have access to this Ohio PDMP data, as state boards of pharmacy often restrict access to their PDMP's to physicians who are licensed in their state. **There is no indication that Dr. Weiss holds or has held an Ohio medical license**. If Dr. Weiss has not held an Ohio medical license, then his actions in prescribing controlled substances to an Ohio resident, to be filled in Ohio might be construed as a violation of the Ohio Medical Practice Act. The Ohio Automated Rx Reporting System (OARxRS) report for patient G.K. lists all of the providers referenced in the PDMP at the end of the report, along with their practice address. While most of the providers on the report have Ohio addresses, Dr. Weiss' practice address is shown as 6900 E. Belleview Ave., Suite 2015 in Greenwood Village, CO. The DEA number attached to this prescribing, per this report, is AW1626300.

Ohio uses the NarxCare scoring system provided by Appriss Health. This system attaches risk scores (a narcotic, a sedative and a stimulant risk score) to patient PDMP's, so that providers can quickly gauge overall controlled substance utilization and the risk of death by unintentional overdose. Several measurements go into these scores, including number of prescribers, number of pharmacies, milligram equivalents and overlapping prescriptions. The overdose risk score of the report ranges from 000 to 999. Patient G.K.'s overdose risk score (ORS) is reported as **860**.  According to the NarxCare guidance, a score range of 801 to 900 corresponds to an odds ratio for unintentional overdose death of 194 (ORS of <200 as the referent scoring group). Dr. Weiss' prescribing of high-dose Adderall, his prescribing of high-dose Xanax and high-dose Adderall in combination, and his prescribing of high-dose Xanax to a potential addict receiving buprenorphine, within a reasonable medical probability, is outside of the usual course of professional practice and is without a legitimate medical purpose.

CONCLUDING REMARKS

The practitioner PDMP on Dr. Weiss provided for my review contained numerous controlled substance entries for a large volume of patients. In this report, I did not include every case in which Dr. Weiss wrote for an unusually high stimulant dose or every case in which he wrote for an unusually high sedative dose or every case in which he wrote for a combination of high-dose stimulant and high-dose sedative or every case in which he wrote for multiple sedative and/or hypnotic drugs in combination. Clearly, all of these patterns of unusual prescribing on the part of Dr. Weiss exist, and each pattern poses not only a risk to the individual patient (i.e., the hazards of stimulant and/or sedative toxicity) but also a societal risk, as I believe that misuse and diversion of these controlled substances a very real possibility in a number of these cases. The societal risk was far more pronounced on the occasions when Dr. Weiss prescribed high dosage units of stimulants or sedatives. These patterns of prescribing in the identified cases appear to deviate from the usual course of professional practice in Psychiatry, and as a matter of general practice.

My opinions are preliminary and based upon examination of the provider PDMP; however, for most of the cases discussed in this report, a final opinion about whether the prescribing was for a legitimate medical purpose can be rendered following a review of the corresponding medical charts. There were several cases in this series in which the magnitude of the controlled substance prescribing alone allowed me to safely say that no legitimate medical purpose existed. Examples of this include Dr. Weiss' co-prescribing of Ativan 8mg/day and Lunesta 9mg/day to patient S.VD., or his prescribing of 150mg of combined mixed amphetamine salts plus Xanax 8mg/day to patient P.V.

The most common mis-prescribing pattern seen on Dr. Weiss' practitioner PDMP was the concurrent prescribing of high-dose stimulants and high-dose sedatives, particularly the combination of Adderall and Xanax. It is interesting that Dr. Weiss's preferred controlled substance combination, Adderall plus Xanax, would feature the most commonly requested stimulant for non-medical use (i.e., in cases of suspected drug seeking) and the most commonly requested benzodiazepine for non-medical use. Data obtained from the SAMHSA (*Drug Abuse Warning Network, 2011: National Estimates of Drug-Related Emergency Department Visits*) revealed that Xanax was implicated in 9.9% of ED visits involving the non-medical use of pharmaceuticals; in this, it outranked the other monitored benzodiazepines, which included clonazepam, diazepam and lorazepam. Considering all of the individual pharmaceuticals – a range of sedative drugs, stimulants and analgesics – monitored in this data collection, Xanax was only outranked by oxycodone, which was implicated in 12.1% of ED visits involving non-medical use of pharmaceuticals. Mixed amphetamine salts (Adderall) topped caffeine and methylphenidate and were implicated in 1.4% of ED visits involving the non-medical use of pharmaceuticals. These findings are mirrored in outpatient clinical experience, where we find that patients requesting stimulants for non-medical use (i.e., drug seeking)

frequently request Adderall and patient requesting sedatives for non-medical use frequently request Xanax.

The increased abuse potential of Xanax compared to other benzodiazepines has been attributed to several factors. These include its *pharmacokinetic* properties:  rapid absorption, low lipophilicity and short half-life. The *pharmacodynamic* properties of high potency and more severe withdrawal after a shorter period of use also contribute to its misuse potential. Xanax also appears to impact the reward system much more strongly than other sedatives, as it causes a striatal dopamine release that is similar to that caused by stimulant drugs. One study in animal models found that alprazolam caused a significant increase in extracellular dopamine concentrations in the striatum, an effect which could not be replicated with lorazepam.

It is important to keep in mind several things when reading this report and weighing the use of stimulants and sedative medications. The first is that not every matter of inattention is due to the syndrome of ADHD. Any evaluation for ADHD must involve screening for other psychiatric problems which can cause or contribute to inattention. It is also preferable to treat those other conditions before coming to the diagnosis of "ADHD" in an adult. Not every case of ADHD requires medication treatment, and use of excessive doses of stimulant mediations is ill-advised. In treating cases of adult ADHD with a stimulant medication, titrating a medication to or beyond the recommended maximum dose is not the treatment goal. Critical dosing values which should alert the reader to potential misprescribing include Adderall > 40mg/day, Adderall XR > 30mg/day, methylphenidate IR > 60mg/day, methylphenidate ER > 72mg/day and Vyvanse > 70mg/day. See APPENDIX A for prescribing guidelines for select medications.  It should also be uncommon to see sedative prescribing at > Xanax 4mg/day (or a dose equivalent of another benzodiazepine) for most anxiety states. Errant prescribing can also come by way of medication combinations, to include the pairing of two stimulant medications (e.g., Adderall plus Adderall XR) to achieve and unreasonably high cumulative stimulant dose or the pairing of high-dose stimulant and sedative (e.g., Adderall plus Xanax), such that the treatment is complicated by the opposing pharmacologic effects of these medications that was discussed earlier in this report.

It's also important for the reader to remember that not every case of anxiety represents "panic disorder" and that SSRI's and SNRI's remain the first-line treatment for most anxiety disorders. Evidence also supports psychosocial interventions (most commonly CBT), for anxiety disorders. Even when benzodiazepine medications are used, they do not generally require high dosing or use for long periods of time. Certainly, before one considers putting a patient on Xanax, they should first scrutinize the presence of any stimulant medication in the regimen. Dr. Weiss seemed to never identify a problem in co-prescribing high-dose Xanax (frequently greater than or equal to 8mg/day) and high-dose Adderall (frequently higher than 60mg/day), as if Adderall had no way of impacting the patient's anxiety level and the Xanax had no way of impacting the patient's cognitive

function. Based upon my review of the PDMP provided to me, when it comes to the prescribing of sedatives and/or stimulant medications, Dr. Weiss more often than not operated outside of the usual course of professional practice. There are numerous cases in this series where his prescribing of controlled substances to patients was unsafe and placed the patient at considerable risk.***''

# APPENDIX A

### Prescribing Recommendations for Select Medications (indication in parentheses)

| MEDICATION | Micromedex | Stahl | CMS | PDR |
|---|---|---|---|---|
| Adderall (ADHD) | Initial dosage: 5mg orally once or twice daily. Titration: increase in 5mg increments at weekly intervals until optimal response; **doses greater than 40mg/d are rarely needed** | Initial 5mg once or twice per day; can increase by 5mg each week. Maximum dose generally 40mg per day. | Initial dose: 5mg once or twice a day. **Maximum dose: 40mg per day.** May increase daily dose by 5mg at weekly intervals until optimal response is achieved. **Only in rare cases will it be necessary to exceed a total of 40mg per day.** | Initially 5mg po once daily or twice daily. Titrate by no more than 5mg/day at weekly intervals to the minimum effective dose. |
| Adderall XR (ADHD) | **Usual dosage is 20mg po qam.** | Initial 10mg po qam. Can increase by 5-10mg/day at weekly intervals. **Maximum dose generally 30mg/day.** | **Recommended dose: 20mg once a day.** | During adult ADHD trials, there was **not adequate evidence that doses greater than 20mg/day ER capsules conferred additional benefit** |
| Methylphenidate IR (ADHD) | 10 to 60mg/day orally divided 2 to 3 times daily | | Average dose 20mg to 30mg per day. **Maximum dose 60mg per day.** | Average effective dose range for adults is 20 to 30mg per day. Dose may be increased to 5 to 10mg/day at weekly intervals. Some patients |

| | | | | may require dosing up to three times daily.  **Maximum is 60mg/day per FDA-approved labeling.** |
|---|---|---|---|---|
| Methylphenidate ER (Concerta, ADHD) | | | Initial dose 18mg or 36mg once a day. **Maximum dose 72mg once a day.** The FDA labelling specifies that the **maximum dosage of methylphenidate ER should not exceed 72mg in adults and adolescents.** | In adults up to age 65 years, initially 18 to 36mg po qam. Dose may be increased by 18mg increments at weekly intervals. **Max 72mg/day.** |
| Vyvanse (ADHD) | Initial dosage: 30mg po once daily in the morning. May increase dosage in increments of 10mg or 20mg per day at approximately weekly intervals to optimal response. **MAX 70mg/day.** | | Initial dose 30mg po daily. **Maximum dose 70mg po daily.** FDA labelling also specifies a maximum dose of 70mg/day. | Initially 30mg po qam. If necessary adjust upwards by 10 to 20mg at weekly intervals. **Do not exceed 70mg/day.** |
| Alprazolam (anxiety) | Initial dosage: 0.25 to 0.5mg orally three times a day; may increase every 3 to 4 days if necessary. MAX daily dose 4mg in divided doses | | Per the FDA labelling, the maximum dosage is 4mg/day, in divided doses. | In non-geriatric adults, initially 0.25mg to 0.5mg po tid. If clinically indicated, adjust upwards at intervals of 3 to 4 days, up to a **maximum of 4mg/day in divided doses**.<br><br>In geriatric adults, start 0.25mg po two |

| | | | | |
|---|---|---|---|---|
| | | | | or three times daily. **Maximum dosage is 4mg/day in divided doses.** |
| Alprazolam (panic disorder) | 0.5mg orally three times a day; may increase dosage by up to 1mg/day every 3 to 4 days. Usual dosage range 1 to 10mg/day (mean 5 to 6mg/day) | | | In non-geriatric adults, initially 0.5mg po tid. The dose may be gradually increased by no more than 1mg/day at intervals of 3 to 4 days. Mean dose of 5 to 6mg/day and maximum of 10mg/day in divided doses. |

### *Additional Information Regarding the Select Patient Cases*

37.     Your affiant read Dr. Walter's initial review of the provider PDMP for Dr.

Howard Weiss, with substantive parts of the report inserted above verbatim, and the

same PDMP records reviewed and analyzed by Dr. Walter.  Your affiant was able to

identify the patients of the select patient cases only referred to by initials in Dr.

Walter's report.  For those select patient cases in the Section titled UNUSUAL

PRESCRIBING PATTERN #1: The Use of Methamphetamine in Adult Patients, your

affiant then conducted DMV, criminal history, and sometimes open source database

checks on the patients.

38.     For those select patients in the Section titled <u>UNUSUAL PRESCRIBING</u>

<u>PATTERN #1: The Use of Methamphetamine in Adult Patients,</u> your affiant learned

the following:

39.     Patient B.E. is identified as Brandee Eighmy.  Patient Eighmy's criminal history

includes prior arrests and convictions in Colorado for Dangerous Drugs, Possession of

Dangerous Drugs, Possession of Drug Paraphernalia, Traffic Offenses, Trespassing,

Burglary, FTAs, and Flight Escape.  Dr. Weiss' PDMP reports Patient Eighmy filled

prescriptions in June and July 2018 written by Dr. Weiss for Alprazolam 2mg tablets,

and filled prescriptions in July and August 2018 written by Dr. Weiss for

Methamphetamine 5mg tablets.  In September 2018, Patient Eighmy was

arrested/charged in Jefferson County and Denver District Court with Robbery,

Assault, Vehicle Theft, Weapons Offense, Theft, and Public Order Crimes; convicted

of Assault, Motor Vehicle Theft Tag, and Robbery; and sentenced to 6 months in jail,

30 months in the custody of the Department of Corrections, and 42 months in the

custody of the Department of Corrections, respectively.

40.     Patient Jo.Fa. is identified as Jon Faulkner.  Patient Faulkner's criminal history

includes prior arrests and convictions for Dangerous Drugs/Possession of

Methamphetamine and Driving Under the Influence (2012); Dangerous

Drugs/Possession of a Controlled Substance (2013); Criminal Possession of ID

Documents-Multiple Victims and Possession of a Controlled Substance (2013);

Dangerous Drugs/Possession of a Controlled Substance (2013); Possession of Drug

Paraphernalia, Traffic Offense Registration-Fictitious Plate, and Making a False

Report (2014); and Forgery (2014).  Dr. Weiss' PDMP reports Patient Faulkner filled

a prescription in November 2017 written by Dr. Weiss in October 2017 for

Methamphetamine 5 mg tablets.  In October 2017, Patient Faulkner was arrested for

Traffic Offenses and Driving Under the Influence, however a disposition is not listed;

and in January 2018, Patient Faulkner was arrested for Pandering-Arranging

Prostitution and Harassment, but the charges were dismissed.

41.     Patients Wa.Johnc. and Wa.Johna. are one and the same and identified as Wayne

Johncock.  Patient Johncock's criminal history includes several arrests for drugs,

theft, driving under the influence, disturbing the peace, damage property, and forgery

in the 1980s and 1990s without dispositions; and arrests and convictions for

Dangerous Drugs/Possession of a Controlled Substance (2000, 2001).  Dr. Weiss'

PDMP reports Patient Johncock filled prescriptions for Methamphetamine 5mg

tablets and two benzodiazepine (Alprazolam and Flurazepam - sedatives) medications

between February 2018 and August 2018.  On October 28, 2018, Patient Johncock

was found unresponsive in his closet at his home.  Emergency medical services

responded, but he could not be resuscitated and was pronounced dead on scene.  The

Coroner's Report states Patient Johncock died of heroin intoxication, and that

Atherosclerotic cardiovascular disease contributed to his death.  Toxicology was

positive for 6-acetylmorphine (a specific metabolite of heroin), morphine (metabolite

of heroin; lethal level), codeine, and small amounts of alprazolam, diazepam, and

nordiazepam.  The manner of death was accident.

42.     Patient Sa.Pr. is identified as Samuel Proctor.  Patient Proctor is the same patient

referred to in paragraphs 21-23 above.

43.     Patient Da.St. is identified as David Stewart.  Patient Stewart's criminal history

includes several arrests and convictions for Dangerous Drugs (2001); Violation of a

Restraining Order (2002); Theft (2002); Vehicular Eluding and Possession of

Controlled Substance (2003); Flight Escapes and Fraud-Impersonation (2003);

Trespassing (2008); Vehicular Eluding, Possession of Controlled Substance,

Possession of a Weapon by a Previous Offender, ID Theft, and Sentence Enhancer-

proven (2009), and suspended driver license for Driving Under the Influence.

44.     Patient P.V. is identified as Patrick Vonnoy on the PDMP, but is further identified

as Patrick Vannoy.  Patient Vannoy's criminal history includes arrests and convictions

for Theft and Possession of a Controlled Substance (2012); and Theft, Possession of a

Controlled Substance, and Driving without a Driver's License (2013).  Dr. Weiss'

PDMP reports Patient Vannoy filled prescriptions for Methamphetamine 5mg tablets

one time in August 2017, and then prescriptions for Alprazolam 2mg tablets,

Dextroamp-amphetamin 30mg tablets, and Dextroamp-amphet ER 30 mg capsules

between August 2017 and December 26, 2017.  On January 16, 2018, Patient Vannoy

was arrested and then convicted for Possession of a Controlled Substance and Driving

Under the Influence.

45.     For those select patient cases in the Section titled UNUSUAL PRESCRIBING

PATTERN #2: High-dose Stimulant Medications with High-dose Sedatives your

affiant was able to identify the following patients identified in the report by initials, as follows:

- Patient C.A. is identified as Chanci Amos

- Patient K.A. is identified as Kathleen Apple

- Patient M.A. is identified as Michael Arrigo

- Patient D.A. is identified as Donna Avonda

- Patient R-T.B. is identified as Robert-Trey Barrett

- Patient E.B. is identified as Emily Barry.  Patient Barry is the same patient referred to in paragraphs 15-17 above.

- Patient L.B. is identified as Lisa Benedict

- Patient Ry.Br. is identified as Ryan Brockley

- Patient P.C. is identified as Patty Christopher

- Patient An.Ci. is identified as Anthony Cicchini

- Patient Ja.De. is identified as Jared DeHaan.  Patient DeHaan is the same patient referred to paragraphs 11-13 above.

- Patient G.E. is identified as Gretchen Ellsmore

- Patient Ja.Fi. is identified as James Finger

- Patient L.F. is identified as Lauren Fried

- Patient J.H. is identified as Jeremy Haley

- Patient S.H. is identified as Stephanie Hall

- Patient A.H. is identified as Amy Hilgendorf

- Patient P.H. is identified as Peter Hoerl

- Patient E.H. is identified as Emily Hudson

- Patient B.K. is identified as Bethany Karulak

- Patient Ky.Ke. is identified as Kyle Kellum

- Patient P.K. is identified as Paul Kelly (deceased)

- Patient Ke.Ke. is identified as Kelley Keys

- Patient J.K. is identified as Jason Kinsey

- Patient S.K. is identified as Stacey Klinger (deceased)

- Patient M.K. is identified as Melissa Kroh

- Patient X.L-B. is identified as Xea Landers-Bergfeld

- Patient C.L. is identified as Cory Lowe

- Patient Tr.Ma. is identified as Travis Matthews

- Patient Th.Ma. is identified as Thomas Mayhew

- Patient D.M. is identified as David McKeever

- Patient A.M. is identified as Alonzo Montoya

- Patient P.M. is identified as Paul Montoya

- Patient W.P. is identified as Wendi Pelton

- Patient Th.Ri. is identified as Thomas Richter

- Patient Ch.Ri. is identified as Charlton Ridings

- Patient Je.Ra. is identified as Jennifer Raymond

- Patient B.R. is identified as Betsy Rubin

- Patient E.S. is identified as Eric Schmalhorst

- Patient Do.Su. is identified as Douglas Sutton

- Patient WR.T. is identified as William Rankin Tickle

- Patient J.T. is identified as Jared Tuck

- Patient Ty.Wa. is identified as Ty Walvatne

- Patient B.Wh. is identified as Brian White

- Patient B.Z. is identified as Brian Zardus

46.    For those select patient cases in the Section titled UNUSUAL PRESCRIBING

PATTERN #3: High-dose Stimulants and Stimulants in Combination your affiant was

able to identify the following patients identified in the report by initials, as follows:

- Patient Co.Be. is identified as Corey Becker

- Patient Kr.Bi. is identified as Krystin Bilyeu

- Patient J.C. is identified as Jordan Cohen

- Patient M.C. is identified as Monica Coogan

- Patient Ch.Co. is identified as Christopher Corbett

- Patient Am.Cr. is identified as Amy Crumb

- Patient Ch.Cu. is identified as Christine Culver

- Patient Au.Da. is identified as Austin Davis

- Patient Ra.Da. is identified as Randy Davis

- Patient K.E.is identified as Krista Elen

- Patient B.F. is identified as Barbara Farland

- Patient A.G. is identified as Addison Glanville

- Patient Je.Lo. is identified as Jessica Logue

- Patient L.L. is identified as Lindsay Lansford, and further identified as Lindsey Lansford

- Patient Am.Ma. is identified as Amanda Manzanares

- Patient K.M. is identified as Kristin McAllister

- Patient S.N. is identified as Stanley Nunley

- Patient Da.Sp. is identified as David Sparks

- Patient Ry.Ro. is identified as Ryan Robson

- Patient J.S. is identified as James Shattuck

- Patient F.S. is identified as Faith Shirley

- Patient Tr.Ye. is identified as Travis Yerre

47.    For those select patient cases in the Section titled <u>UNUSUAL PRESCRIBING</u>

<u>PATTERN #4: High-dose Sedatives and Sedatives in Combination</u> your affiant was

able to identify the following patients identified in the report by initials, as follows:

- Patient S.A. is identified as Shannon Altman

- Patient T.B. is identified as Tanner Bouchard

- Patient J.C-L. is identified as Jaime Chavez-Loya

- Patient N.D. is identified as Nina Denton

- Patient St.Le. is identified as Steve/Steven Lewis

- Patient Sh.Li. is identified as Shelly Liggett

- Patient H.M. is identified as Helen Mitchell

- Patient Mi.Po. is identified as Michael Pogar

- Patient Co.Ro. is identified as Courtney Roetz

- Patient Jo.Sc. is identified as John Schmitz

- Patient Da.So. is identified as Daniel Soderberg

- Patient S.VD. is identified as Sara VanDittie

- Patient Be.Wa. is identified as Bethany Waiss

48.    In the Section titled THE OHIO PATIENT your affiant was able to identify "THE OHIO PATIENT" as Gage Krug, referred to as G.K. in Attachment B.

## FINANCIAL INVESTIGATION

49.    According to the Colorado Department of Labor and Employment records, Howard S. Weiss (SSN: 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) has no reported wages.

50.    According to National Crimes Information Center (NCIC), Howard S. Weiss has a criminal history of mail fraud in 1995.

51.    The investigation revealed that one Currency Transaction Report (CTR) was filed on Howard S. Weiss and Anna Weiss (ex-spouse) on January 10, 2013 for a cash deposit of $10,470 on December 28, 2012 into an account with Bank of the West.

52.    The financial information in the following paragraphs was received pursuant to Grand Jury subpoenas.

**Facilitating Account – Wells Fargo Bank Account #1723272660**

53.     The investigation has revealed that on November 3, 2015, Dr. Weiss opened a

bank account with Wells Fargo Bank (Account #1723272660). The account holder

was Howard S. Weiss.

54.     The bank records that have been analyzed for Account #1723272660 show total

deposits from November 3, 2015 to February 7, 2018 of $632,045.39.  The deposits

include fifty-eight (58) cash deposits totaling $503,985.00, which appear to be

"structured cash deposits."  Of the fifty-eight (58) cash deposits to the account, forty-

five are in excess of $9,000.00 but below the $10,000.00 threshold which would

require the bank to file a CTR.  Specifically, those forty-five deposits range from

$9,060.00 to $9,980.00.  The source of the cash deposits is unknown, but this is not a

normal practice for a psychiatrist business.  In addition, there was a deposit on April

19, 2017 of an IRS tax refund for $111,413.00 into the Wells Fargo account, which is

not normal.

55.     Investigators spoke to Wells Fargo Bank employees who handled several of the

fifty-eight cash deposits into Dr. Weiss' account (#1723272660).

56.     Steven Paulukovich, a former lead teller for Wells Fargo Bank at the Denver Tech

Center (DTC) branch, was interviewed on September 5, 2018.  Mr. Paulukovich

recognized Dr. Weiss in Wells Fargo Bank surveillance camera photos presented to

him as a bank customer that would come into the DTC branch and make unusually

large cash deposits approximately every two weeks.  Mr. Paulukovich dealt with Dr.

Weiss at the bank approximately 20 to 30 times. Mr. Paulukovich recalled Dr. Weiss

wearing a robe-like jacket and pulling a "wad" of cash out from a pocket within the

"robe" to be deposited on several occasions.  Mr. Paulukovich stated there was a money counter next to his teller station and when Dr. Weiss came in to make a cash deposit, Dr. Weiss would ask that the cash be counted two or more times.  After the cash was counted two or more times and the amount was revealed to Dr. Weiss, Dr. Weiss would then take back some of the cash so that the deposited amount would not be more than $10,000.  Dr. Weiss took cash back and told the teller that the excess amount was not part of the same deposit.  Dr. Weiss mentioned it was easier for his patients to pay in cash rather than through medical insurance.  Mr. Paulukovich stated the cash had a smell or odor of a medical office.  Mr. Paulukovich stated other customers who worked in the medical field rarely deposited cash into the bank like Dr. Weiss.  Specifically, if customers employed in the medical field made large cash deposits, they generally used an armored courier service or the night drop for security purposes.

57.     Becky Helgesen, a former teller for Wells Fargo Bank at the 7481 East Arapahoe Road, Englewood Colorado branch, was interviewed on September 6, 2018.  Ms. Helgesen was specifically asked about a cash deposit transaction she conducted as a teller on July 8, 2016 at the Wells Fargo branch when a customer presented her with $10,200 in cash and she returned $300 to the customer so the cash deposit was only $9,900 into Wells Fargo Bank Account #1723272660, owned by Dr. Weiss.  Ms. Helgesen recalled the specific transaction because when she was processing the transaction she immediately recognized it as a text book "structuring" transaction, and it was her first and only experience with a "structured" cash transaction as a bank

teller at both Wells Fargo and the bank she was working at the time of the interview. Ms. Helgesen said the customer gave her the cash, which she ran through the money counter twice, and when she told the customer the amount totaled $10,200, the customer said something to the effect of, "Oh, can I just have that $300?"  Ms. Helgesen gave the $300 back to the customer, reran the cash through the money counter, and deposited the $9,900 into the customer's account.  Ms. Helgesen believed the customer knew about the $10,000 threshold for filing a CTR based on the customer requesting the $300 back to make the deposit less than $10,000.

58.     The account was closed on February 7, 2018. The remaining balance of $74,155.24 was deposited into a Merrill Lynch account (#85A-15733) held in the name of Howard S. Weiss, which is discussed in more detail below.

59.     Based on the information above, there is probable cause to believe that all funds up to $503,985.00 that were deposited into Wells Fargo Bank Account #1723272660 during the period the account was open constituted proceeds from Dr. Weiss' distribution and dispensing of controlled substances without a medical purpose and outside the usual course of professional practice. In addition, there is probable cause to believe that all funds up to $503,985.00 that were deposited into Wells Fargo Bank Account #1723272660 during the period the account was open were laundered through this account and structured in order to avoid transaction reporting requirements in violation of 18 U.S.C. § 1956 and 31 U.S.C. § 5324.  As noted above, this account was closed on February 7, 2018.  However, it was used to funnel money into the other accounts discussed below.

**Bank of the West Account #40936981**

60.     The investigation also has revealed that Howard S. Weiss, M.D. has a bank account with Bank of the West (Account #40936981), which was opened on November 4, 2015.  This account appears to have been used as an operating account for Dr. Weiss' medical practice.

61.     Pursuant to a Grand Jury Subpoena, investigators received bank records for the period January 4, 2017 through December 21, 2018.  These bank records for Bank of the West Account #40936981 show total deposits from January 4, 2017 to December 21, 2018 of $550,635.69.  The total deposits include cash deposits of $293,348.00. The source of the cash deposits is unknown, but not a normal practice for a psychiatrist business.  In addition, there were other deposits totaling $257,287.69 into the account, which is comprised mostly of checks from patients and medical insurance companies.  Analysis of the checks deposited into the Bank of the West Account (#40936981) shows that more than $57,000.00 was deposited into the account through checks written by purported patients identified by Dr. Walter, the consulting expert, in the "Case Presentation" section of his report. For example, Patient S.VD. (identified in Paragraph 47 as Sara VanDittie) wrote checks totaling $11,120.00 to Dr. Weiss that were deposited into the Bank of the West Account (#40936981) during 2017-2018. As indicated on page 52, Patient S.VD. was prescribed a "high-dose lorazepam concurrently with an excessive dose of Lunesta," which in Dr. Walter's opinion "is outside of the usual course of professional practice and is without a legitimate medical purpose." Also, there were withdrawals from

Bank of the West Account # 0936981 totaling $388,907.28 for rent, billing services, credit card payments, taxes and other operational expenses. More specifically, there were five checks (#2564 - $72,000, #2595 - $50,000, #2589 - $30,000, #2608 - $50,000, and #2622 - $66,000) written to the United States Treasury for estimated tax payments from January 19, 2017 to January 18, 2018. This totaled $268,000 in estimated tax payments made from Bank of the West Account #40936981.

62.     Pursuant to a second Grand Jury Subpoena, investigators obtained bank records for the period December 22, 2018 through May 21, 2019 for Bank of the West Account #40936981. These records show additional total deposits from December 22, 2018 to May 21, 2019 of $114,026.11. The source of these deposits is unknown due to the fact that the records provided by Bank of the West only included the bank statements for Account #40936981, and not the underlying documents such as deposit slips and checks. However, based on records provided by Merrill Lynch, it is clear that on May 21, 2019, check #2693 for $286,000 cleared Bank of the West Account #40936981 and was deposited into Merrill Lynch Account #85A-15733, discussed in more detail below.

63.     During the period December 22, 2018 to May 21, 2019, the total amount of withdrawals from Bank of the West Account #40936981 was $350,166.85. The account balance of Bank of the West Account #40936981 on May 21, 2019 was $4,340.52.

64.     Based on the information above, there is probable cause to believe that Howard Weiss, M.D.'s medical practice utilized this account as an operating account, paying

rent, billing services, and other operating expenses from this account, while also depositing money into this account that is proceeds from Dr. Weiss' illegal activity of dispensing controlled substances without a medical purpose and outside the usual course of professional practice.  Therefore, Dr. Weiss' medical practice commingled funds in this account, which is indicative of money laundering activities to disguise the ownership and nature of any illegal proceeds generated from the illegal dispensing of controlled substances.  Accordingly, there is probable cause to believe that Dr. Weiss' medical practice was engaged in money laundering in violation of 18 U.S.C. § 1956 and, therefore, the business and all assets of the business are property involved in money-laundering. As a result, the government seeks to seize all funds held in Bank of the West Account #40936981.

**Investment Accounts**

65.     From the Wells Fargo Bank (#1723272660) account, the Bank of the West (#40936981) account, and the JPMC Bank, N.A. (#938566515) account (discussed in more detail below), Dr. Weiss transferred substantial sums of monies into his various Merrill Lynch accounts and his Amundi Pioneer Investments account (#85A08F02).[5] Analysis of Merrill Lynch records shows that Dr. Weiss has at least seven investment accounts held at Merrill Lynch. The government seeks to seize funds held in three of these accounts as discussed below: Dr. Weiss' investments account (Account #85A-15623), Dr. Weiss' holding account (Account #85A-15733), and Dr. Weiss' SEP IRA (Account #85A-83997).  Investigators continue to investigate the other four accounts.

5 The Amundi Pioneer Investments account is discussed in more detail below and was closed on June 9, 2017.

66.     From Wells Fargo Bank Account #1723272660, there has been $561,036.24

traced to Merrill Lynch investment accounts for the benefit of Howard Weiss from

August 22, 2016 to February 7, 2018, when it was closed.  Specifically, the following

deposits were made to Merrill Lynch accounts from Wells Fargo Bank Account

#1723272660:

| **Merrill Lynch Account #85A-15733** | | **Merrill Lynch Account #85A-15623** | |
|---|---|---|---|
| August 22, 2016 | $70,000.00 | January 13, 2017 | $95,000.00 |
| April 27, 2017 | $103,235.00 | April 27, 2017 | $20,646.00 |
| August 21, 2017 | $73,000.00 | August 21, 2017 | $25,000.00 |
| November 21, 2017 | $100,000.00 | | |
| February 2, 2018 | $74,155.24 | | |

Based on the bank records available to date, this money remains in the Merrill Lynch

investment accounts.

**Merrill Lynch Accounts #85A-15733 and #85A-83997**

67.     In addition, in July 2016, Dr. Weiss opened an investment account with Amundi

Pioneer Investments (#85A08F02). The initial contribution of $24,100.00 came from

Merrill Lynch Account #85A-15733, held in the name of Howard Weiss. On April 3,

2017, Dr. Weiss transferred $15,667.00 from Wells Fargo Bank Account

#1723272660 with check #157 into his Amundi Pioneer Investments Account

#85A08F02. On June 1, 2017, Dr. Weiss made a $39,767.00 contribution from his

Merrill Lynch Account #85A-15733 to his Amundi Pioneer Investments account

#85A08F02. The Amundi Pioneer investment account was closed on June 9, 2017

and the proceeds from the account totaling $82,204.24 were transferred to Merrill

Lynch Account #85A-05142, an account held in the name of Howard S. Weiss, MD.[6] Notably, the June 1, 2017 $39,767.00 contribution from Merrill Lynch Account #85A-15733 was transferred, via the Amundi Pioneer investment account, to Merrill Lynch Account #85A-05142 just over a week after it left Merrill Lynch Account #85A-15733.

68.     The records also confirm deposits totaling $81,029 made into the Merrill Lynch investment accounts from JPMC Bank, NA Account #938566515, which was opened in the name of Howard S. Weiss on January 29, 2018. The bank records for JPMC Bank, NA Account #938566515 show total deposits from January 29, 2018 to September 24, 2018 of $85,558.84.  The deposits include one cash deposit totaling $8,900, which appears to be a "structured cash deposit" below the $10,000.00 threshold which would require the bank to file a CTR.  The source of the cash deposit is unknown, but not a normal practice for a psychiatrist business.  In addition, there was a deposit of $75,000 from Merrill Lynch Account #85A-15733 into JPMC Bank Account #938566515 on February 9, 2018.  Notably, just over a month later, on March 17, 2018, check #98 totaling $81,029 from JPMC Bank Account #938566515 was deposited into two Merrill Lynch Accounts (#85A-83997 and #85A-15733) totaling $45,531 and $35,498, respectively. The JPMC Bank Account #938566515 had little other activity during this period.  Accordingly, the February 9, 2018 $75,000 deposit from Merrill Lynch Account #85A-15733 and the March 17, 2018 deposit of $81,029 from JPMC Bank Account #938566515 into Merrill Lynch Accounts #85A-

---

6 At the time of this affidavit, the financial records for Merrill Lynch Account #85A-05142 have not been obtained,

83997 and #85A-15733 represent substantial changes in the balance of JPMC Bank Account #938566515.

**Other Deposits**

69.     Further analysis of the Merrill Lynch investment accounts shows that on May 6, 2016 a check (#20271988) from Heritage Title Company totaling $139,476.03 was deposited into Merrill Lynch Account #85A-15733.  Also, identified were three checks totaling $19,000.00 from Bank of America Account #041160300852 from Natalie Weiss and one check totaling $493.60 from Wells Fargo Account #1010319055159 from Edith E. Weiss that were deposited into Merrill Lynch Account #85A-15623.  Additionally, on April 13, 2018, a check (#403835622664) from United States Treasury totaling $107,912.00 was deposited into Merrill Lynch account #85A-15733.

**Updated Merrill Lynch Records**

70.     Pursuant to a second Grand Jury Subpoena, investigators received records on June 14, 2019 from Merrill Lynch for the three Merrill Lynch accounts discussed herein for the period August 1, 2018 through May 31, 2019.  Analysis of the records for Merrill Lynch Account #85A-15733 shows two checks deposited for $50,000 each on September 4, 2018 and February 26, 2019 from unknown sources.  Notably, on May 21, 2019 check #2693 for $286,000 from Bank of the West Account #40936981, Howard S. Weiss, M.D.'s operating account discussed above, was deposited into Merrill Lynch Account #85A-15733.  This represents a substantial deposit from Dr.

---

but investigators are in the process of obtaining them.

Weiss' practice's operating account into Dr. Weiss' personal investment holding account, which resulted in a May 21, 2019 closing balance in the Bank of the West Account #40936981 operating account of $4,340.52, as discussed above.  As of May 31, 2019, the account balance of Merrill Lynch Account #85A-15733 was $769,581.23.

71.     Analysis of the records for Merrill Lynch Account #85A-15623 shows $195,000 transferred from Merrill Lynch Account #85A-15733 to Merrill Lynch Account #85A-15623 between August 1, 2018 to May 31, 2019.  This includes periodic transfers ranging from $20,000 to $50,000.  As of May 31, 2019, the account balance of Merrill Lynch Account #85A-15623 was $1,864,084.99.

72.     Analysis of the records for Merrill Lynch Account #85A-83997 shows a transfer of $36,000 from Merrill Lynch Account #85A-15733 to Merrill Lynch Account #85A-83997 in March of 2019.  As of May 31, 2019, the account balance of Merrill Lynch Account #85A-83997 was $926,173.92.

**Financial Analysis Conclusion**

73.     Based on the information above, there is probable cause to believe that Howard Weiss, M.D.'s medical practice utilized Bank of the West Account #40936981 as an operating account, paying rent, billing services, and other operating expenses from this account, while also depositing money into this account that is proceeds from Dr. Weiss' illegal activity of dispensing controlled substances without a medical purpose and outside the usual course of professional practice.  Therefore, Dr. Weiss' medical practice commingled funds in this account, which is indicative of money laundering

activities to disguise the ownership and nature of any illegal proceeds generated from the illegal dispensing of controlled substances.  Accordingly, there is probable cause to believe that Dr. Weiss' medical practice was engaged in money laundering in violation of 18 U.S.C. § 1956 and, therefore, the business and all assets of the business are property involved in money-laundering. As a result, the government seeks to seize all funds held in Bank of the West Account #40936981.

74.      Based on the information above, there is probable cause to believe that Dr. Weiss utilized Merrill Lynch Account #85A-15733 and Merrill Lynch Account #85A-83997 to commingle proceeds from Dr. Weiss' illegal activity of dispensing controlled substances without a medical purpose and outside the usual course of professional practice with other funds, which is indicative of money laundering activities to disguise the ownership and nature of any illegal proceeds generated from the illegal dispensing of controlled substances.  Accordingly, there is probable cause to believe that Merrill Lynch Account #85A-15733 and Merrill Lynch Account #85A-83997 were utilized to launder money in violation of 18 U.S.C. § 1956 and, therefore, all funds held in these accounts are property involved in money-laundering. Accordingly, the government seeks to seize all funds held in Merrill Lynch Account #85A-15733 and Merrill Lynch Account #85A-83997.

75.      Merrill Lynch Account #85A-15623 had a balance of $677,459.50 in January 2016 and substantial contributions from sources other than those described herein. Accordingly, the government is not seeking to forfeit all funds held in the account. Based on the information above, as of May 31, 2019, analysis of the records

establishes that at least $742,884.00 of contributions to Merrill Lynch Account #85A-15623 were funds traced from Wells Fargo Account #1723272660, JPMC Bank Account #938566515, and other Merrill Lynch accounts held by Dr. Weiss, which represent illegal proceeds from Dr. Weiss' distribution and dispensing of controlled substances without a medical purpose and outside the usual course of professional practice. In addition, as of May 31, 2019, analysis of the records establishes that at least $97,463.10 of the money held in the account represents growth over time, which the government also seeks to seize.  Accordingly, the government seeks to seize $840,347.10 from Merrill Lynch Account #85A-15623.

## CONCLUSION

76.     Based on the foregoing, there is probable cause to believe that Dr. Howard Weiss has distributed and caused to be dispensed controlled substances without a legitimate medical purpose and outside the usual course of professional practice; there is probable cause to believe Dr. Weiss has participated in the concealment of his criminal activities by transacting his business almost exclusively in cash and then structuring his deposits in federally insured financial institutions to avoid federal reporting requirements.

77.     I believe based upon my training and experience, as well as the below-described regulation regarding the maintenance of medical records, that the patient charts and medical records for the above-described patients are maintained at Dr. Weiss' practice, which is located at the address described in Attachment A. Also, based on my training and experience, I know that most medical practices maintain patient

medical records and financial records in both hardcopy and electronic format on computers.

78.     Colorado Revised Statute (C.R.S.) 12-36-140 Protection of medical records – licensee's obligations – verification of compliance – noncompliance grounds for discipline rules states:

> *(1) Each licensed physician and physician assistant shall develop a written plan to ensure the security of patient medical records.  The plan shall address at least the following: (a) The storage and proper disposal, if appropriate, of patient medical records; (b) The disposition of patient medical records in the event the licensee dies, retires, or otherwise ceases to practice or provide medical care to patients; and (c) The method by which patients may access or obtain their medical records promptly if any of the events described in paragraph (b) of this subsection (1) occurs. (2) Upon initial licensure under this article and upon renewal of a license, the applicant or licensee, as applicable, shall attest to the board that he or she has developed a plan in compliance with this section. (3) A licensee shall inform each patient, in writing, of the method by which the patient may access or obtain his or her medical records if an event described in paragraph (b) of subsection (1) of this section occurs. (4) A licensee who fails to comply with this section shall be subject to discipline in accordance with section 12-36-118.  (4) The board may adopt rules as necessary to implement this section.*

79.     The Colorado Medical Board provides direction on the laws, rules and policies as related to Medical Practice, including medical record retention and protection. The Colorado Medical Board Policies Section on Practice Policies, Statements & Guidelines includes subsection 40-7: Guidelines Pertaining to the Retention and Release of Medical Records:

> *1(A) Written Plan to Ensure Security of Patient Medical Records, and 1(B) Notice to Patients Regarding Written Plan are covered in the above reference to C.R.S. 12-36-140; 1(C) Retention Period; and 1(D) Disability, Death or Discontinuation of Practice.  Of particular relevance is 1(C) Retention Period, which is further explained as (1) The Board recommends retaining all patient*

*records for a minimum of seven years after the last date of treatment or seven years after the patient reaches age 18, whichever occurs later; and (2) In case of litigation or Board investigation, records must be retained until resolution of the matter or seven years after the last date of treatment or seven years after the patient reaches age 18, whichever occurs later.*

80.     There is also probable cause to believe the evidence, fruits and instrumentalities of the crimes set forth herein in Attachment B, incorporated herein by reference, may be found inside the premise that has been identified above and in Attachment A.

## **RECENT UNDERCOVER**

81.     On June 7, 2019, Special Agent Gesi, acting in an undercover capacity, called Dr. Weiss, in an attempt to investigate the conduct described above.  During multiple recorded conversations between SA Gesi and Dr. Weiss, Dr. Weiss confirmed the address of his medical practice as 6900 E. Belleview Avenue, Suite 205.  Dr. Weiss also asked if SA Gesi had looked at Dr. Weiss' website.  Your affiant and SA Gesi have both looked at Dr. Weiss' website, www.howardweissmd.com and observed the contact information for Dr. Weiss included "My office is located at:  6900 E. Belleview Avenue, Suite 205, Greenwood Village, CO 80111."

82.     Your affiant believes the location of Dr. Weiss' business premises and where Dr. Weiss conducts business is 6900 E. Belleview Avenue, Suite 205, Greenwood Village, Colorado 80111 because, (a) Dr. Weiss' registered address with the DEA is 6900 E. Belleview Avenue, Suite 205, Greenwood Village, CO 80111; (b) Dr. Weiss' website showing Dr. Weiss' office is located at 6900 E. Belleview Avenue, Suite 205,

Greenwood Village, CO 80111; and (c) Dr. Weiss confirming with a potential patient

on June 7, 2019 that his office is located at 6900 E. Belleview Avenue, Suite 205.

## SERVICE OF THE SEARCH WARRANT

83.    Your affiant, or other duly authorized Federal Agents or other authorized local or

federal law enforcement officials, will personally serve the search warrant requested

above, and will be assisted by other duly authorized federal investigators, state task

force officers, federal medical experts and/or computer specialists.  Your affiant, any

other duly authorized Investigator or computer specialist will be present at all times,

and will personally supervise the execution of this warrant.

84.    If a computer or electronic database search is authorized, it is the intention of your

affiant to have a specialist experienced in the seizure of computer evidence be

available at the search to "image" or copy the material on the office computer systems

and laptop so that the systems themselves need not be seized.  In the event the

imaging of the systems prove technically impossible, then certain electronic storage

devices, along with related peripherals, software, related documentation, passwords,

data security devices, and data may need to be seized so that the data contained

therein can be searched later by a qualified computer expert in a laboratory or other

controlled environment.  The actual computers will be seized only if absolutely

necessary.

85.    Your affiant will make arrangements to copy the seized patient files within 96

hours of seizure and will return copies of the medical files and charts to Dr. Weiss

within 5 business days.

## SEALING/RESTRICTION OF THIS AFFIDAVIT

86.     It is respectfully submitted that revelation of this warrant affidavit, which includes

sensitive information, could jeopardize the ongoing investigations included herein.  In

addition, this affidavit contains confidential patient health care information, financial

information, and personal identification information, which warrants protection.

Therefore, it is requested that the Court issue an order pursuant to which this

Application and Supporting Affidavit be filed and kept under seal or restricted until

further order from the Court.

The above information is true and correct to the best of my knowledge.


*s/Brenna McIntosh*
Brenna McIntosh
Special Agent
Drug Enforcement Administration


UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO


**Reviewed and submitted by Jaime Pena, Assistant United States Attorney.**